[Cite as *State v. Hayes*, 2016-Ohio-7241.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

STATE OF OHIO

    Plaintiff-Appellee

v.

RYAN M. HAYES

    Defendant-Appellant

:
:
:
:
:
:
:
:
:
:

C.A. CASE NO. 26379

T.C. NO. 2012-CR-2182

(Criminal appeal from
Common Pleas Court)

. . . . . . . . . . .

**O P I N I O N**

Rendered on the ___7th___ day of _____October_____, 2016.

. . . . . . . . . . .

KIRSTEN A. BRANDT, Atty. Reg. No. 0070162, Assistant Prosecuting Attorney, 301 West Third Street, 5th Floor, Dayton, Ohio 45422
    Attorney for Plaintiff-Appellee

DARRELL L. HECKMAN, Atty. Reg. No. 0002389, One Monument Square, Suite 200, Urbana, Ohio 43078
    Attorney for Defendant-Appellant

. . . . . . . . . . . .

DONOVAN, P.J.

{¶ 1} Defendant-appellant Ryan M. Hayes appeals his conviction and sentence for the following offenses, to wit: one count of aggravated vehicular homicide, in violation of R.C. 2903.06(A)(1), a felony of the second degree; one count of aggravated vehicular homicide, in violation of R.C. 2903.06(A)(2), a felony of the third degree; one count of OVI

(.17 or greater-whole blood), in violation of R.C. 4511.19(A)(1)(f)/(G)(1)(a), a misdemeanor of the first degree; and OVI (under the influence), in violation of R.C. 4511.19(A)(1)(a)/(G)(1)(a), also a misdemeanor of the first degree. Hayes filed a timely notice of appeal with this Court on September 8, 2014.

{¶ 2} The incident which forms the basis for the instant appeal occurred on the night of September 17, 2011, when Hayes drove his parents' black 1991 Lexus sedan into a stationary track hoe at a construction site located near Hoover Avenue in Dayton, Ohio. While Hayes was severely injured, his passenger and girlfriend, Qadriyyah Harvey, was killed after suffering blunt force trauma when her head hit the windshield during the crash. The evidence adduced during the trial established that neither Hayes nor Harvey were wearing their seatbelts at the time of the crash, which was found to have occurred at approximately 8:50 p.m.

{¶ 3} Hayes was removed from the vehicle by paramedics and taken to Miami Valley Hospital (MVH) for treatment. Harvey was pronounced dead at the scene of the crash. Dayton Fire Department firefighter/paramedic Tyler McCoy testified that he detected the odor of alcohol on and about Hayes' person. McCoy testified that the odor of alcohol persisted even after he removed Hayes from the crash site. McCoy further testified that Hayes admitted that he had consumed alcohol prior to the crash.

{¶ 4} Dayton Police Detective Jonathan Seiter, a crash reconstructionist in the traffic services unit, was dispatched to the site after it was determined that the crash involved a fatality. Upon arriving at the scene of the accident, Detective Seiter inspected the vehicle. Detective Seiter testified that he detected the slight of odor of alcohol emanating from the interior of the vehicle. Detective Seiter also observed a wallet and

an opened can of Sparks alcoholic iced tea in the driver's side floorboard of the vehicle.

{¶ 5} Detective Seiter then traveled to MVH in order to interview Hayes. Upon arriving at the hospital, Detective Seiter located Hayes in the trauma room. Detective Seiter testified that Hayes was unconscious and smelled of alcohol. Thereafter, Detective Seiter directed phlebotomist Ross Melton to draw Hayes' blood as part of an OVI kit. Prior to drawing Hayes' blood, both Detective Seiter and Melton attempted to wake him up, but Hayes could not be roused. At approximately 11:20 p.m., Melton drew two vials of Hayes' blood for testing. Detective Seiter took possession of Hayes' blood, transported it to the Safety Building, and placed it in a refrigerator. Detective Seiter then completed a form requesting that Hayes' blood be tested at the Miami Valley Regional Crime Lab (MVRCL).

{¶ 6} Elizabeth Kiely, a forensic toxicologist at the MVRCL, tested Hayes' blood samples on September 28, 2011. Kiely testified that the tests revealed that the two samples of Hayes' blood had an alcohol concentration of .173 and .169 gram percent, the average of which is .171 which is more than twice the legal limit of .08 percent. Kiely testified that she also screened Hayes' blood for the presence of drugs. The sample tested positive for marijuana metabolite. Forensic toxicologist Brian Simons tested Hayes' blood in order to determine the amount of marijuana metabolite present. Simons' testing established that the amount of marijuana metabolite present in Hayes' blood was fourteen nanograms per milliliter.

{¶ 7} On January 24, 2013, Hayes was indicted for one count of aggravated vehicular homicide (OVI), one count of aggravated vehicular homicide (recklessly), one count of OVI (.17 or greater-whole blood), and one count of OVI (under the influence).

At his arraignment on January 29, 2013, Hayes pled not guilty to all of the offenses contained in the indictment. On February 13, 2013, Hayes filed a waiver of time for speedy trial purposes.

{¶ 8} Shortly thereafter, Hayes filed a motion to suppress the results of the blood test administered at MVH on the night of the accident. A hearing was held on said motion on July 8, 2013. On August 26, 2013, the trial court issued a decision overruling Hayes' motion to suppress, finding that the results of his blood test would be admissible at trial.

{¶ 9} On January 17, 2014, the trial court appointed new counsel to represent Hayes. On February 3, 2014, Hayes' new counsel filed a second motion to suppress the results of the blood test in which he challenged the MVRCL's compliance with the Ohio Administrative Code provisions regarding the procedures for the handling and processing of blood samples, as well as the destruction of blood samples. A hearing was held with respect to Hayes' second motion to suppress on March 6, 2014. The trial court ultimately overruled Hayes' second motion in a decision issued on April 30, 2014.

{¶ 10} Hayes' case proceeded to a three-day jury trial beginning on August 18, 2014, and ending on August 20, 2014, after which he was found guilty of all counts in the indictment. On September 3, 2014, the trial court merged Count II, aggravated vehicular homicide (recklessly), into Count I, aggravated vehicular homicide (OVI); and Count IV, OVI (under the influence), into Count III, OVI (.17 or greater-whole blood). Thereafter, the trial court sentenced Hayes to a mandatory seven years in prison for aggravated vehicular homicide (OVI) and 180 days in prison for OVI (.17 or greater-whole blood), the sentences to run consecutive to one another for an aggregate term of seven and one-half years.

**{¶ 11}** It is from this judgment that Hayes now appeals.[1]

**{¶ 12}** Hayes' first assignment of error is as follows:

**{¶ 13}** "THE TRIAL COURT ERRED IN SENTENCING DEFENDANT FOR BOTH AGGRAVATED VEHICULAR HOMICIDE UNDER R.C. §2903.06(A)(1)(A) AND O.V.I UNDER R.C. §4511.19(A)(1), AS THEY WERE ALLIED OFFENSES OF SIMILAR IMPORT."

**{¶ 14}** In his first assignment, Hayes contends that his convictions for aggravated vehicular homicide and OVI were allied offenses. Therefore, Hayes argues that the trial court erred when it failed to merge the two offenses for the purpose of sentencing. Additionally, Hayes argues that the trial court erred when it imposed consecutive sentences for those offenses in violation of R.C. 2929.41(B)(3).

**{¶ 15} ALLIED OFFENSES**

**{¶ 16}** R.C. 2941.25, Ohio's allied offense statute, provides that:

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as

---

[1] We note that Hayes' original appointed appellate counsel filed a brief pursuant to *Anders v. California*, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967). We ultimately rejected counsel's *Anders'* brief and appointed new appellate counsel in a decision and entry filed on June 5, 2015.

to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶ 17} The Ohio Supreme Court recently clarified the applicable standard when determining whether offenses merge as allied offenses of similar import. *State v. Ruff,* 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892.

Rather than compare the elements of two offenses to determine whether they are allied offenses of similar import, the analysis must focus on the defendant's conduct to determine whether one or more convictions may result, because an offense may be committed in a variety of ways and the offenses committed may have different import. No bright-line rule can govern every situation.

As a practical matter, when determining whether offenses are allied offenses of similar import within the meaning of R.C. 2941.25, courts must ask three questions when the defendant's conduct supports multiple offenses: (1) Were the offenses dissimilar in import or significance?; (2) Were they committed separately?; and (3) Were they committed with separate animus or motivation? An affirmative answer to any of the above will permit separate convictions. The conduct, the animus, and the import must all be considered.

*Ruff* at ¶ 30-31.

{¶ 18} Most recently in *State v. McGail,* 2015-Ohio-5384, 55 N.E.2d 513 (2d Dist.), we stated the following:

[T]he Ohio Supreme Court addressed the allied-offense issue again in *State*

*v. Earley,* [145 Ohio St.3d 281,] 2015-Ohio-4615, [49 N.E.3d 266]. There the majority characterized the analysis in its earlier *Johnson* lead opinion as "largely obsolete." *Id.* at ¶ 11. The *Earley* court instead embraced *Ruff,* which, as noted above, considers a defendant's *conduct,* his *animus,* and the *import* or significance of his offenses. Applying *Ruff,* the *Earley* court concluded that misdemeanor OVI and felony aggravated vehicular assault "are offenses of dissimilar import and significance that are to be punished cumulatively." *Earley* at ¶ 20. For purposes of our analysis here, we note that a defendant bears the burden of establishing entitlement to merger, and we review a trial court's ruling on the issue de novo. *State v. LeGrant,* 2d Dist. Miami No. 2013-CA-44, 2014-Ohio-5803, ¶ 15.

* * *

We reach the same conclusion under the *Ruff* standard, which the Ohio Supreme Court applied in *Earley.* We see nothing in *Ruff* that alters or undermines the foregoing analysis about McGail's commission of murder and aggravated robbery involving the same conduct committed with the same animus. For the reasons set forth above, we conclude that the two offenses were not committed separately and were not committed with a separate animus or motivation. These findings remain pertinent under *Ruff,* which, as noted above, provides that offenses do not merge if "(1) the offenses are dissimilar in import or significance -- in other words, each offense caused separate, identifiable harm, (2) the offenses were committed separately, or (3) the offenses were committed with separate

animus or motivation."   *Ruff* at ¶ 25; *see also id.* at ¶ 30-31.
*McGail,* at ¶ 51 & 60.

{¶ 19} Hayes argues that his aggravated vehicular homicide and OVI offenses are allied offenses of similar import pursuant to *State v. Johnson,* 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 1061, and that the trial court committed plain error when it sentenced him for both.

{¶ 20} As noted above, the Ohio Supreme Court decided a similar issue in *State v. Earley*, 145 Ohio St.3d 281, 2015-Ohio-4615, 49 N.E.3d 266.   In *Earley*, the defendant pled guilty to aggravated vehicular assault and OVI. *Id.* at ¶ 2.   The trial court sentenced the defendant for both offenses and ordered that her sentences be served concurrently. *Id.*   The defendant appealed her sentences, claiming that aggravated vehicular assault is an allied offense of OVI and that they should have merged. *Id.* at ¶ 3.   The court of appeals affirmed the judgment of the trial court and held that even assuming that aggravated vehicular assault and OVI are allied offenses, R.C. 2929.41(B)(3) creates an exception that permits a trial court to impose a sentence for both.   *See State v. Earley,* 2014-Ohio-2643, 15 N.E.3d 357, ¶ 20-21 (8th Dist.).

{¶ 21} Upon review, the Ohio Supreme Court held that the trial court did not err in sentencing the defendant for both OVI and aggravated vehicular assault because the two offenses are not allied offenses of similar import.   Applying its prior decision in *Ruff*, the *Earley* court stated the following:

> By criminalizing aggravated vehicular assault under R.C. 2903.08(A)(1)(a) and classifying it as a third-degree felony with a mandatory prison term, the General Assembly emphasized the necessity of a strong

punishment for and deterrent against individuals causing serious physical harm while driving under the influence. This felony offense has a different import and significance than merely driving under the influence, for aggravated vehicular assault necessarily involves causing serious physical harm to another person. A first-degree misdemeanor violation of R.C. 4511.19(A)(1)(a), on the other hand, occurs any time an individual drives under the influence of alcohol or drugs, and one who does so commits this offense regardless of any subsequent consequences that occur due to the impaired driver's actions. There is a legitimate justification for criminalizing each of these offenses separately, and R.C. 2941.25 permits separate convictions for both pursuant to the test set forth in *Ruff*.

Thus, because the affirmative answer to the first *Ruff* question allows Earley to be separately convicted of each offense, the trial court did not commit plain error -- and did not err at all -- in not merging the convictions.

*State v. Earley,* 145 Ohio St.3d 281, at ¶¶ 15, 16.

{¶ 22} While the instant case does not involve a conviction for aggravated vehicular assault under R.C. 2903.08(A)(1)(a) and OVI in violation of R.C. 4511.19(A)(1)(a), the court's rationale in *Earley* is clearly applicable here. Hayes was convicted and sentenced for aggravated vehicular homicide, in violation of R.C. 2903.06(A)(1), a felony of the second degree, and OVI (.17 or greater-whole blood), in violation of R.C. 4511.19(A)(1)(f)/(G)(1)(A), a misdemeanor of the first degree.

{¶ 23} R.C. 2903.06(A)(1) states as follows:

(A) No person, while operating or participating in the operation of a motor

vehicle, * * * shall cause the death of another * * * in any of the following ways:

(1)(a) As the proximate result of committing a violation of division (A) of section 4511.19 of the Revised Code or of a substantially equivalent municipal ordinance[.]

Moreover, R.C. 2903.06(B)(2)(a) provides that "aggravated vehicular homicide committed in violation of division (A)(1) of this section is a felony of the second degree and the court shall impose a mandatory prison term on the offender."

{¶ 24} Conversely, R.C. 4511.19(A)(1)(f) states in pertinent part:

(A)(1) No person shall operate any vehicle * * * within this state, if, at the time of the operation, any of the following apply:

* * *

(f) The person has a concentration of seventeen-hundredths of one per cent or more by weight per unit volume of alcohol in the person's whole blood.

Unless otherwise specified, a violation of R.C. 4511.19(A)(1)(f) is classified as a misdemeanor of the first degree carrying a mandatory jail term of at least three consecutive days and a requirement that the offender attend, for three consecutive days, a certified drivers' intervention program. R.C. 4511.19(G)(1)(a) and (G)(1)(a)(ii).

{¶ 25} Applying the rationale set forth in *Earley*, we conclude that aggravated vehicular homicide under R.C. 2903.06(A)(1) and OVI under R.C. 4511.19(A)(1)(f) are not allied offenses. Rather, by criminalizing aggravated vehicular homicide and classifying it as a felony of the second degree requiring mandatory prison time, the legislature "emphasized the necessity of a strong punishment for and deterrent against

individuals causing" the death of another person while driving under the influence. *Earley* at ¶ 15. Since aggravated vehicular homicide necessarily involves causing the death of another person, the felony offense has a different import and significance than merely driving under the influence. *Id.* Conversely, a first-degree misdemeanor violation of R.C. 4511.19(A)(1)(f), "occurs any time an individual drives under the influence of alcohol or drugs, and one who does so commits this offense regardless of any subsequent consequences that occur due to the impaired driver's actions." *Id.* Accordingly, the trial court did not err when it failed to merge Hayes' convictions for aggravated vehicular homicide and OVI.

### {¶ 26} IMPOSITION OF CONSECUTIVE SENTENCES

{¶ 27} Here, Hayes argues that the trial court erred when it ordered that his sentences for aggravated vehicular homicide and OVI be served consecutively. Specifically, Hayes asserts that the record suggests that the trial court was under the mistaken belief that consecutive sentences were mandatory. We note that Hayes did not object to the imposition of consecutive sentences, so all but plain error has been forfeited.

{¶ 28} For plain error to exist, the defect in the trial proceedings must be obvious and must have affected the outcome of the trial. *State v. Payne,* 114 Ohio St.3d 502, 2007-Ohio-4642, 873 N.E.2d 306, ¶ 16. "Notice of plain error 'is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.' " *State v. Lang,* 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 108, quoting *State v. Long,* 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus.

{¶ 29}  R.C. 2929.41(B)(3) states in pertinent part:

A jail term or sentence of imprisonment imposed for a misdemeanor violation of section * * * 4511.19 of the Revised Code shall be served consecutively to a prison term that is imposed for a felony violation of section 2903.06 * * * of the Revised Code * * * *when the trial court specifies that it is to be served consecutively*.

Thus, the language of R.C. 2929.41(B)(3) explicitly provides that a sentence for a violation of R.C. 4511.19, OVI, can be served either consecutively or concurrently to a sentence for a violation of R.C. 2903.06, aggravated vehicular homicide. *Earley* at ¶ 20.

{¶ 30} However, Hayes argues that the record establishes that the trial court was under the mistaken impression that consecutive sentences were mandatory.   In support of his contention, Hayes cites to the following statements made by the trial court at his sentencing hearing:

The Court: Mr. Hayes, in regards to Count I, the aggravated vehicular homicide, I am going to sentence you to seven years in the Corrections Reception Center.   That sentence is mandatory pursuant to [R.C.] 2929.13.

Regards to Count III, the OVI charge, I am going to sentence you to the maximum of 180 days incarceration.   *And pursuant to [R.C.] 2929.41(B)(3) the sentence is to run consecutive to Count I of this case and will be served after your felony conviction has ran.*

{¶ 31} The instant case is clearly distinguishable from the case cited by Hayes, *State v. Schidecker*, 2d Dist. Montgomery No. 26334, 2015-Ohio-1400, wherein we found

that the trial court mistakenly concluded it had no choice under R.C. 2929.41(B)(3) other than to impose the sentence consecutively. During the sentencing hearing, the trial court stated that:

> The Court imposes a sentence of 30 consecutive days of local incarceration which, by law, *must run consecutively* to the sentence on Count I and Count III. *I will say again that the Court believes, as a matter of law, that the sentence on Count VI, the OVI count, must run consecutively to the sentence on Count I and Count III.* That's my legal determination based on the authorities I've reviewed prior to sentencing. The first six consecutive days of that sentence on Count VI are mandatory and cannot be reduced.

*Id.* at ¶ 44. Based on the above statements at sentencing, we found that the trial court erred when it concluded that it was required to impose the misdemeanor OVI sentence consecutively pursuant to R.C. 2929.41(B)(3). *Id.* at ¶ 45.

{¶ 32} Upon review, we conclude that the trial court's statements do not indicate that it mistakenly believed that it was *required* to impose consecutive sentences pursuant to R.C. 2929.41(B)(3). Rather, the statements indicate an acknowledgment on the part of the trial court that it was merely imposing consecutive sentences pursuant to the discretion afforded it by the language in R.C. 2929.41(B)(3). On this record, the trial court merely referenced the statute which gave it discretionary authority to impose consecutive sentences.

{¶ 33} Hayes' first assignment of error is overruled.

{¶ 34} Because they are interrelated, Hayes' second, third, and fourth

assignments of error will be discussed together as follows:

{¶ 35} "THE TRIAL COURT ERRED IN OVERRULING DEFENDANT-APPELLANT'S MOTION TO SUPPRESS BECAUSE THE SAMPLE WAS TAKEN IN VIOLATION OF THE ARREST REQUIREMENTS OF THE IMPLIED CONSENT LAW."

{¶ 36} "THE TRIAL COURT ERRED IN OVERRULING DEFENDANT'S MOTION TO SUPPRESS BECAUSE HE WAS NOT GIVEN A CHANCE TO WITHHOLD OR REVOKE IMPLIED CONSENT."

{¶ 37} "THE TRIAL COURT ERRED IN OVERRULING DEFENDANT'S MOTION TO SUPPRESS AS THE EVIDENCE OBTAINED WAS THE RESULT OF AN UNCONSTITUTIONAL SEARCH AND SEIZURE."

{¶ 38} In his second, third, and fourth assignments, Hayes contends that the trial court erred when it overruled his motion to suppress for the following reasons, to wit: 1) the blood sample was taken in violation of the implied consent law because he had not been arrested when the sample was drawn; 2) he was not given the opportunity to withhold or revoke implied consent; and 3) the taking of the blood sample was an unconstitutional search and seizure.

{¶ 39} As this Court has previously noted:

"Appellate courts give great deference to the factual findings of the trier of facts. (Internal citations omitted). At a suppression hearing, the trial court serves as the trier of fact, and must judge the credibility of witnesses and the weight of the evidence. (Internal citations omitted). The trial court is in the best position to resolve questions of fact and evaluate witness credibility. (Internal citations omitted). In reviewing a trial court's decision

on a motion to suppress, an appellate court accepts the trial court's factual findings, relies on the trial court's ability to assess the credibility of witnesses, and independently determines whether the trial court applied the proper legal standard to the facts as found. (Internal citations omitted). An appellate court is bound to accept the trial court's factual findings as long as they are supported by competent, credible evidence." *State v. Hurt,* Montgomery App. No. 21009, 2006-Ohio-990.

*State v. Purser,* 2d Dist. Greene No. 2006 CA 14, 2007-Ohio-192, ¶ 11.

{¶ 40} "The Fourth Amendment to the United States Constitution and the Ohio Constitution, Article I, Section 14, prohibit unreasonable searches and seizures." *State v. Emerson,* 134 Ohio St.3d 191, 2012-Ohio-5047, 981 N.E.2d 787, ¶ 15. The constitutional provisions contain nearly identical language and have been interpreted to afford the same protection. *State v. Hoffman,* 141 Ohio St.3d 428, 2014-Ohio-4795, 25 N.E.3d 993, ¶ 11.

{¶ 41} The Fourth Amendment protects against two types of unreasonable intrusions: 1) searches, which occur when an expectation of privacy that society is prepared to consider reasonable is infringed upon and 2) seizures, which occur when there is some meaningful interference with an individual's liberty or possessory interest in property. *See State v. Jacobsen*, 466 U.S. 109, 113, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984).

{¶ 42} "[S]earches and seizures conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated

exceptions." *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). "Once the defendant demonstrates that he was subjected to a warrantless search or seizure, the burden shifts to the state to establish that the warrantless search or seizure was constitutionally permissible." *State v. Roberts,* 110 Ohio St.3d 71, 2006-Ohio-3665, 850 N.E.2d 1168, ¶ 98.

{¶ 43} The withdrawal of a sample of blood from the body of an individual in order to determine its blood-alcohol content for the purpose of proving a criminal charge constitutes a search within the meaning of the Fourth Amendment. *Schmerber v. California*, 384 U.S. 757, 767, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). Fourth Amendment analysis neither permits nor forbids all such bodily intrusions; rather, "the Fourth Amendment's proper function is to constrain, not against all intrusions as such, but against intrusions which are not justified in the circumstances, or which are made in an improper manner." *Id.* at 768.

{¶ 44} R.C. 4511.19(D)(1)(b) provides that "[i]n any criminal prosecution * * * for a violation of division (A) or (B) of this section or for an equivalent offense that is vehicle-related, * * * [t]he court may admit evidence on the concentration of alcohol * * * when a person submits to a blood * * * test at the request of a law enforcement officer under section 4511.191 of the Revised Code or a blood * * * sample is obtained pursuant to a search warrant." A criminal prosecution for aggravated vehicular homicide under R.C. 2903.06 is a prosecution for an "equivalent offense" as defined in R.C. 4511.181(A)(4).

{¶ 45} **IMPLIED-CONSENT**

{¶ 46} Under Ohio's implied-consent statute, R.C. 4511.191, "[a]ny person who operates a vehicle * * * upon a highway * * * shall be deemed to have given consent to a

chemical test or tests of the person's whole blood, blood serum or plasma, * * * to determine the alcohol * * * content of the person's whole blood, blood serum or plasma * * * if arrested for a violation of division (A) or (B) of section 4511.19 of the Revised Code, section 4511.194 of the Revised Code or a substantially equivalent municipal ordinance, or a municipal OVI ordinance." R.C. 4511.191(A)(2). R.C. 4511.191(A)(4) further specifies that "[a]ny person who is dead or unconscious, or who otherwise is in a condition rendering the person incapable of refusal, shall be deemed to have consented as provided in division (A)(2) of this section, and the test or tests may be administered subject to sections 313.12 to 313.16 of the Revised Code." " 'R.C. 4511.191 * * * was enacted to protect innocent motorists and pedestrians from injury and death caused by irresponsible acts of unsafe drivers on Ohio streets and highways. The broad purpose of the implied-consent statute is to clear the highways of and to protect the public from unsafe drivers.' " *State v. Uskert,* 85 Ohio St.3d 593, 598, 709 N.E.2d 1200 (1999), quoting *Hoban v. Rice,* 25 Ohio St.2d 111, 114, 267 N.E.2d 311 (1971). Hayes argues that the trial court should have suppressed his blood-alcohol test because: 1) no search warrant authorized the blood draw, and 2) the implied consent statute does not apply because he was never arrested before the sample was drawn since he was unconscious at the time.

{¶ 47} One of the well-delineated exceptions to the general prohibition against a warrantless search occurs when the person consents to the search. *State v. Morris,* 42 Ohio St.2d 307, 318, 329 N.E.2d 85 (1975). As previously discussed, R.C. 4511.191(A)(4) specifically deems an unconscious or incapacitated person to have consented to a blood test if there is probable cause to believe that the person has been

operating a motor vehicle while intoxicated. *See, generally,* Weiler and Weiler, *Ohio Driving Under the Influence Law,* Section 8:6 (2014 Ed.); *State v. Troyer,* 9th Dist. Wayne No. 02-CA-0022, 2003-Ohio-536, ¶ 26 ("the Fourth Amendment does not require an arrest before a blood sample may be taken from an unconscious driver believed to have been driving under the influence of alcohol"); *State v. Taylor,* 2 Ohio App.3d 394, 395, 442 N.E.2d 491 (12th Dist.1982) ("We read [former] R.C. 4511.191(B) [now R.C. 4511.191(A)(4)] to authorize the withdrawal of blood from an unconscious individual by an officer who has reasonable grounds to believe the person to have been driving a motor vehicle upon the public highways of this state while under the influence of alcohol, whether or not the unconscious person is actually placed under arrest"). This typically occurs when the person has been involved in a serious accident and is unconscious or unresponsive at the scene or shortly thereafter. Weiler and Weiler, *Ohio Driving Under the Influence Law* at Section 8:6.

> * * * In the blood sample case, * * * there is no room whatsoever for the argument that the lack of a formal arrest may decrease somewhat the chances that the evidence will be destroyed, for the "evanescent" character of the evidence is inherent in its nature and does not depend upon any motive of the defendant to destroy it. * * * It is the height of formalism, to say the least, to suggest that a warrantless search on probable cause in order to meet this emergency is reasonable only if the police first declare the hospitalized defendant under arrest. In particular, it "would be ridiculous to require a police officer to perform some formal ritual of arrest over the unconscious body of a critically injured person who was a party to a fatal

automobile accident." The claim that the contrary position "provides some measure of assurance that probable cause is based upon considerations independent of the blood-alcohol test results" is untenable, as the need for a court to determine that probable cause existed prior to the test is present under either rule. (Citations omitted.)

3 LaFave, Search and Seizure (1996) 161-62, Section 5.4(b).

{¶ 48} We also note that the Sixth Circuit, among several other courts, has adopted the view that the Fourth Amendment does not require an arrest prior to administering a blood-alcohol test to an unconscious driver believed to have been driving under the influence of alcohol. *United States v. Berry*, 866 F.2d 887, 888 (6th Cir.1989); *see also State v. Oevering*, 268 N.W.2d 68, 73 (Minn.1978) (requiring "arrest ritual" of unconscious victims of alcohol-related accidents would be "absurd"); *State v. Campbell*, 189 Mont. 107, 115-116, 615 P.2d 190 (1980); *Wilhelmi v. Director of the Dept. of Transp.*, 498 N.W.2d 150, 154 (N.D.1993) (formal arrest of an unconscious driver would be an "empty gesture"); *State v. Milligan*, 304 Ore. 659, 671-72, 748 P.2d 130 (1988).

{¶ 49} Hayes cites to our recent decision in *State v. Rawnsley,* 2d Dist. Montgomery No. 24594, 2011-Ohio-5696, for the proposition that the implied-consent statute, R.C. 4511.191, applies *only* to those individuals who have been placed under arrest. The defendant in *Rawnsley*, however, was not unconscious at the time that the police officer directed her blood to be drawn for alcohol testing. Accordingly, *Rawnsley* is distinguishable from the instant case. In light of the foregoing analysis, we agree with the trial court that the Fourth Amendment does not require an arrest before a blood sample may be drawn from an unconscious driver who is believed to have been driving

under the influence of alcohol. *State v. Troyer,* 9th Dist. Wayne No. 02-CA-0022, 2003-Ohio-536, ¶ 26.

**{¶ 50} PROBABLE CAUSE**

**{¶ 51}** We also agree with the trial court that Detective Seiter had probable cause to believe that Hayes had been operating a motor vehicle while he was intoxicated. Probable cause, specifically in terms of arrests for driving under the influence, is determined by whether, at the time of arrest, the officer had sufficient information, from a reasonably trustworthy source, of facts and circumstances that are sufficient to make a prudent person believe the suspect was driving under the influence. *State v. Sheppeard*, 2d Dist. Clark No. 2012 CA 27, 2013-Ohio-812, ¶ 41. Probable cause is determined from the totality of the circumstances. *Illinois v. Gates*, 462 U.S. 213, 233, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). A law officer's decision to conduct a warrantless search is evaluated first by the trial court and is reviewed by this court de novo. *Ornelas v. United States*, 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996) (determinations of reasonable suspicion and probable cause are generally reviewed de novo).

**{¶ 52}** In the instant case, we find that at the time that Detective Seiter ordered Hayes' blood sample taken, the totality of the circumstances was sufficient to warrant a prudent person to believe that he had been driving under the influence of alcohol and that a blood-alcohol test would provide evidence thereof. Initially, we note that McCoy testified that upon arriving at the scene of the accident, he observed one vehicle that had been driven directly into a large, stationary, unmanned track hoe. The motor vehicle had sustained serious front-end damage. McCoy testified that he observed that there were two occupants in the front seats of the vehicle, a male located in the driver's seat and an

unconscious female in the passenger seat. McCoy testified that the man in the driver's seat identified himself as Ryan Hayes. McCoy testified that he detected the strong odor of alcohol on Hayes as he approached the vehicle. McCoy further testified that Hayes admitted to consuming alcohol as he was being transported to the hospital.

{¶ 53} Detective Seiter also observed the aftermath of the one-car accident. Specifically, Detective Seiter testified that he observed that the vehicle had run directly into the right track of the track hoe, and the front of the car was completely destroyed. There were no other vehicles involved in the accident besides the track hoe and Hayes' car. The construction site where the accident occurred was marked and clearly visible, to wit: 1) there were several, reflective "road closed" signs visible when approaching the site; 2) there was orange netting and reflective, flashing lights at the entrance of the site; 3) there was a large mound of dirt and gravel; and 4) there was a twenty-foot tall yellow track hoe with a large scoop bucket into which Hayes drove to cause the accident. Detective Seiter testified that he learned from some first responders to the accident that Hayes had been found in the driver's seat of the vehicle. Upon examination, Detective Seiter testified that he detected a slight to moderate odor of alcohol coming from the interior of the vehicle. Detective Seiter also testified that he detected the moderate odor of alcohol emanating from Hayes' body at the hospital. Accordingly, the totality of the circumstances present when Detective Seiter directed that blood be drawn from an unconscious Hayes supports the trial court's finding that probable cause existed to believe that he had been driving under the influence of alcohol when he crashed into the track hoe.

{¶ 54} **EXIGENT CIRCUMSTANCES**

{¶ 55} Although not discussed by the trial court in its decision overruling Hayes' motion to suppress, we find that exigent circumstances existed which support Detective Seiter's decision to administer a warrantless blood-alcohol test. Before the results of a nonconsensual, warrantless blood-alcohol test may be admitted into evidence, there must be a demonstration that the circumstances come within a specifically established and well-delineated exception. *See Katz*, 389 U.S. at 357. One of these exceptions, excusing the obtaining of a warrant is the existence of an exigent circumstance. *Troyer* at ¶ 27. The *Schmerber* court concluded that because of the rapid rate at which alcohol diminishes in the blood, and because it would take some time for the officer to investigate and find facts establishing probable cause, there would be no time reasonably to expect the officer to obtain a warrant. *Schmerber,* 384 U.S. at 770-71. Such facts demonstrate an exigent circumstance, excusing the obtaining of a warrant.

{¶ 56} In *Schmerber*, the petitioner challenged his conviction for driving while intoxicated upon the basis that the warrantless seizure of his blood, over his objection, violated his Fourth Amendment rights. In rejecting his claim, the U.S. Supreme Court held that a warrantless seizure could be justified based upon the "evanescent nature" of the evidence, i.e., the fact that the level of alcohol in blood decreased with the passage of time. *Id.* at 779. Because of the fleeting nature of the evidence, the time necessary to obtain a warrant, and the prior establishment of probable cause to justify an arrest, the Court upheld the warrantless seizure of the petitioner's blood as reasonable under the Fourth Amendment. "Although there was an arrest in *Schmerber,* the Court did not make its holding dependent upon the fact that the defendant had been arrested, *only that there was probable cause for the DUI arrest."* (Emphasis added.) *See State v. King,* 1st Dist.

Hamilton No.C-010778, 2003-Ohio-1541, at ¶ 26. "[T]here now appears to be universal agreement among the courts that have addressed the question that an arrest is not integral to the *Schmerber* holding and, consequently, that a warrantless extraction of blood from a driver lawfully suspected of DUI, does not violate the [F]ourth [A]mendment even in the absence of an arrest or actual consent." *Id.*

{¶ 57} In the instant case, rescue units were dispatched to the scene of the accident at approximately 8:48 p.m., but did not arrive on the scene until 9:01 p.m. because of road closures due to construction. McCoy transported Hayes to the hospital from the crash site, arriving at approximately 9:30 p.m. After investigating the scene of the accident, Det. Seiter traveled to the hospital in order to interview Hayes, but was not able to arrive until approximately two hours after the crash.

{¶ 58} At that point, Hayes was unconscious, but the alcohol in his system was likely still dissipating. More importantly, the three-hour window within which to obtain a blood sample for testing had almost passed. Indeed, the record establishes that Hayes' blood was drawn at 11:20 p.m., leaving only approximately twenty minutes before the three-hour window expired. By the time Detective Seiter made his probable cause determination after observing an unconscious Hayes at the hospital, "the logistics of preparing an application for a search warrant, possibly having to contact a prosecutor to assist, drafting it, and then locating and obtaining a judge's signature, would undoubtedly [have taken] a reasonably long period of time." *State v. Roar*, 4th Dist. Pike No. 13CA842, 2014-Ohio-5214, ¶ 31. During that time, the alcohol, and therefore the evidence, would have been dissipating from Hayes' body. Upon review, we conclude that the exigent circumstances justified the taking of Hayes' blood without a search warrant.

**{¶ 59}** Hayes' second, third, and fourth assignments of error are overruled.

**{¶ 60}** Hayes' fifth assignment of error is as follows:

**{¶ 61}** "THE TRIAL COURT ERRED IN OVERRULING DEFENDANT'S MOTION TO EXCLUDE BLOOD TEST EVIDENCE THAT WAS DESTROYED BEFORE DEFENDANT WAS CHARGED WITH A CRIME.

**{¶ 62}** Ohio Adm. Code 3701-53-06 requires laboratories to retain all positive plasma, serum, blood, and urine specimens "for a period of not less than one year, after which time the specimens may be discarded unless otherwise directed in writing from a court to retain such specimen for a longer period."   In his fifth assignment, Hayes argues that the trial court erred when it overruled his motion to suppress because the MVRCL destroyed his blood sample in December of 2012, after storing the sample for only fourteen months.

**{¶ 63}** The Due Process Clause of the Fourteenth Amendment to the United States Constitution protects a criminal defendant from being convicted where the state fails to preserve materially exculpatory evidence or destroys in bad faith potentially useful evidence. *State v. Wells*, 2d Dist. Greene No. 2003CA68, 2004-Ohio-1026, ¶ 49.   To be materially exculpatory, "evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.,* quoting *California v. Trombetta*, 467 U.S. 479, 489, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984) (failure to preserve breath samples did not violate due process); *Illinois v. Fisher*, 540 U.S. 544, 545, 124 S.Ct. 1200, 157 L.Ed.2d 1060 (2004).   When evidence is only potentially exculpatory, the destruction of such evidence does not violate due process if

the police act in good faith and the evidence is disposed of in accordance with normal procedures. *State v. Rains*, 135 Ohio App.3d 547, 553, 735 N.E.2d 1 (6th Dist.1999), citing *Arizona v. Youngblood*, 488 U.S. 51, 58, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988). In other words, when faced "with the failure of the State to preserve evidentiary material of which no more can be said then that it could have been subjected to tests, the results of which might have exonerated the defendant," due process is violated only if the state acted in bad faith. *Youngblood,* 488 U.S. at 57.

**{¶ 64}** In the instant case, we characterize Hayes' blood sample as "potentially useful" evidence. *State v. Barron*, 2d Dist. Greene No. 10-CA-28, 2011-Ohio-2425, ¶ 16. Certainly, there is at least a chance that further testing may have revealed a different blood-alcohol concentration. However, the blood sample was not exculpatory evidence because it had already been tested three times by Kiely. Rather, the hospital testing indicates that it was inculpatory. The first test was positive for the presence of alcohol. The second test quantified Hayes' blood alcohol content at .171 gram percent, more than twice the legal limit for an adult in Ohio. The third test performed by Kiely was positive for the presence of marijuana metabolite.

**{¶ 65}** As previously stated, Ohio Adm.Code 3701-53-06 requires laboratories to retain all positive plasma, serum, blood, and urine specimens "for a period of not less than one year, after which time the specimens may be discarded unless otherwise directed in writing from a court to retain such specimen for a longer period." Kiely testified that pursuant to its own internal procedures, MVRCL keeps its samples in storage for fourteen months, two months longer than what is required by law. Kiely testified that Hayes' blood sample was kept by MVRCL for fourteen months and then destroyed

pursuant to its internal policy. Prior to the destruction of the blood sample, there was no request from Hayes, the State, or the police to retain the blood sample past the fourteen month limit. Kiely testified that had such a request been made, MVRCL would have honored it.

{¶ 66} On the record before us, there is no evidence that MVRCL acted outside of its normal procedures, nor is there evidence that the State acted in bad faith in permitting the destruction of such evidence. Accordingly, the trial court properly concluded that the admission of the results from Hayes' blood tests did not violate due process.

{¶ 67} Hayes' fifth assignment of error is overruled.

{¶ 68} Hayes' sixth assignment of error is as follows:

{¶ 69} "THE TRIAL COURT ERRED IN OVERRULING DEFENDANT'S MOTION TO EXCLUDE A GRUESOME AUTOPSY PHOTOGRAPH, SHOWING DECEDENT[']S OPEN SKULL AFTER AUTOPSY."

{¶ 70} In his sixth assignment, Hayes contends that the trial court erred when it admitted, over his objection, State's Exhibit 6, which depicted an interior anatomical view of the injury to Qadriyyah Harvey's spinal cord which occurred as a result of the car accident which ultimately caused her death. Hayes argues that the photograph was gruesome and repetitious and only served "to inflame the passion of the jury." Evid.R. 403(A). The trial court concluded that the photograph was necessary to help the jury understand the coroner's testimony regarding medical issues and the cause of death, and that its probative value was not substantially outweighed by the danger of unfair prejudice. We agree.

{¶ 71} The admission or exclusion of evidence such as photographs is left to the

sound discretion of the trial court and will not be disturbed on appeal absent an abuse of that discretion. *State v. Morales*, 32 Ohio St.3d 252, 257, 513 N.E.2d 267 (1987); *State v. Whitfield*, 2d Dist. Montgomery No. 22432, 2009-Ohio-293, ¶ 122.

{¶ 72} "Abuse of discretion" has been defined as an attitude that is unreasonable, arbitrary or unconscionable. *Huffman v. Hair Surgeon, Inc.,* 19 Ohio St.3d 83, 87, 482 N.E.2d 1248 (1985). It is to be expected that most instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary.

{¶ 73} A decision is unreasonable if there is no sound reasoning process that would support that decision. It is not enough that the reviewing court, were it deciding the issue *de novo,* would not have found that reasoning process to be persuasive, perhaps in view of countervailing reasoning processes that would support a contrary result. *AAAA Enterprises, Inc. v. River Place Community Urban Redevelopment Corp.,* 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990).

{¶ 74} The State had the burden to prove, beyond a reasonable doubt, that Hayes caused the death of Harvey while operating a motor vehicle and as a proximate result of committing an OVI. The photograph was clearly probative of such matters and was presented during the testimony of Dr. Russell Uptegrove, who performed the autopsy on Harvey, for the purpose of explaining to the jury his opinion concerning the cause of her death. With respect to Harvey's cause of death, Dr. Uptegrove provided the following testimony:

> Dr. Uptegrove: * * * Upon removal of the skull cap, after reflecting the
> scalp, and the initial examination of the brain, [Harvey] did have a small area

on the base of the brain where there was a kind of focal area, a hemorrhage.

When the brain was actually removed from the cranial vault or removed from the skull, I was able to actually manipulate the head because there was looseness or some laxity in-between the junction between the base of the skull and the neck to the vertebra in the upper neck. So, essentially, the head was sort of knocked loose, so to speak, off the vertebra involving the neck.

Now, in looking at that, sometimes the spinal cord can be completely transected. In this particular case, it wasn't transected but there was actual compression of the spinal cord because of this laxity or looseness of the head where it is attached to the neck. And also emanating from that, there was a focal area of some hemorrhage located in the upper neck surrounding the vertebral bodies of the upper neck.

* * *

The State: And this compression, if you will, of the vertebral cord, that sort of thing that's coming up through the neck and connecting to the head, what would that have done medically to her?

Dr. Uptegrove: Well, the brain stem which is at the base of the brain in this general area where this laxity developed, when it proceeds downward it turns into the cervical spinal cord. Because the primary function of the brain stem is to regulate autonomic functions meaning that it causes one's heart to continue beating without having to think about your heart beating and it also controls the respiratory drive to breathe so when there is an injury

to the brain stem or cervical spinal cord, in that high of a level, one's heartbeat and the ability to breathe can be significantly compromised.

Q: Would that be a fatal injury?

A: It can be. * * *

{¶ 75} When asked to explain State's Exhibit 6, which depicted the injuries to Harvey that he described in the previous testimony, Dr. Uptegrove stated the following:

The State: And State's Exhibit 6.   Tell us what we're seeing here, Doctor.

Dr. Uptegrove: All right.   It's going to take just a little bit of orientation here.   This is an internal picture of [Harvey's] upper neck.

***

But this, all this dark red area here in the neck is hemorrhage again which is associated with the trauma which happened with the damage of the ligaments and the other soft tissue between the base of the skull and the upper level of the vertebral body.   So there's, you know, hemorrhage associated in the soft tissue in this general area.

Q: And just so we're clear.   When you say hemorrhage, you mean, you mean what?

A: Bleeding.

* * *

Q: And you mentioned that the bleeding was caused by sort of the damage that was happening to the vertebral cord and also the ligaments there?

A: Yes.

Q: What would that be consistent with?   What could have caused that?

A: The most common situation, seeing this type of trauma, is a blunt force injury to the head.   And, again, there can be numerous types of scenarios that could cause that, but that's the basic mechanism.

Q: And that could mean a car crash, then?

A: Yes.

**{¶ 76}** The trial court properly admitted the autopsy photograph at issue in this case because it helped the jury to understand the coroner's testimony regarding the cause of Harvey's death, and the photograph was relevant and probative of the allegation that Defendant caused her death when he crashed the vehicle in which she was a passenger while he was intoxicated.   The photograph, which depicted the internal damage done to Harvey which resulted in her death, depicted things the other autopsy photographs did not. *Whitfield* at ¶ 125.   The probative value of the autopsy photograph was not substantially outweighed by the danger of unfair prejudice.   As we stated in *State v. Wade*, 2d Dist. Montgomery No. 21530, 2007-Ohio-1060, ¶ 35:

Autopsy photos are inherently prejudicial when they depict gruesome, graphic wounds, but when offered to prove elements of the offense that the State has the burden of proving, they are usually not *unfairly* prejudicial.   That is the case here.

**{¶ 77}** Accordingly, the trial court did not abuse its discretion in admitting State's Exhibit 6.

{¶ 78} Hayes' sixth assignment of error is overruled.

{¶ 79} Hayes' seventh assignment of error is as follows:

{¶ 80} "THE TRIAL COURT ERRED IN PERMITTING CONTINUING HARASSING QUESTIONS OF DEFENDANT."

{¶ 81} In his seventh assignment, Hayes argues that the State committed prosecutorial misconduct when the prosecutor cross-examined him. Specifically, Hayes asserts that through repetitive questioning permitted by the trial court, the State "badger[ed]" him and deprived him of a fair trial.

{¶ 82} The test for prosecutorial misconduct is whether the remarks were improper, and if so, whether they prejudicially affected the accused's substantial rights. *State v. Smith,* 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984). The touchstone of the analysis "is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips,* 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). The question is whether the prosecutor's misconduct so infected the accused's trial with unfairness that the accused's convictions came in violation of the right to due process. *Donnelly v. DeChristoforo,* 416 U.S. 637, 644, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974).

{¶ 83} All of the alleged prosecutorial misconduct identified by Hayes occurred when he was cross-examined by the State. Hayes argues that the first instance of misconduct occurred when the State asked him if he had used Hoover Avenue since February of 2011, but before the crash on September 17, 2011. Hayes answered, "[n]ot that I could remember." The record reflects that the State then asked Hayes essentially the same question two more times. We note that defense counsel did not object to the State's questioning in this regard. The first instance of alleged misconduct occurred

during the following exchange:

> Q: Okay. And are you telling this jury that never once did you go from Brookhaven to Little Richmond, to Olive, to Hoover Avenue from February of 2011 to the night of this crash in September of 2011.
>
> A: Not that I could remember. It's alternate routes that you could get to that area.
>
> Q: And my question is did you ever take that route? We already heard about the route you claimed to take. But are you telling this jury that in all the months from February that you claim was the last time you were on Hoover, right – February of 2011?
>
> A: Correct.
>
> Q: That from February, 2011 to September 17, 2011 you never once took that route from your parents' place here over to Olive Road to Hoover. Is that you testimony?
>
> A: Yes.

{¶ 84} Thereafter, the State asked Hayes several times to identify the time of day that he had his first alcoholic beverage on September 17, 2011, the day of the crash. Defense counsel eventually objected to the State's repetition of the question, but the trial court overruled the objection. The exchange proceeded as follows:

> Q: Okay. Now, you told us that you drank no alcohol before what time on Saturday? What time did you start drinking alcohol that evening of that day?
>
> A: No time before nine in the morning or – it was in the afternoon

when I started drinking.

Q: Will you tell us when –

A: Afternoon or night.   Had to be in between five and seven.

Q: Not between four and five p.m.?

A: Four – it might have been that.   I know around five – five o' clock, ma'am.

Q: Around five?   Is that your answer now?   That you started.

A: I'm trying to remember back.   It's hard.   I have a learning disability.   Around that time.

Q: Around five p.m. then, is that right?

A: Right – yes.   It's what –

Q: Are you unsure about that, sir.

A: No, I'm – I'm just thinking I don't want to – trying to think the time I just – I had told you previous before.

Q: Trying to keep it consistent with what you had said on direct?

A: I'm trying to – let me see how I can phrase this.   I just want to be clear to the jury what –

Q: Uh-huh –

A: -- time I said –

Q: All right.   But as we sit here now on cross-examination, you're telling us it was roughly five o' clock, fair?   That you started drinking that day?

A: Did I not say it was around four or five or five –

***

A: -- not say it was five o' clock?

***

Q: It's not for you to ask the questions, sir. It's actually for me to ask the questions. Are you telling us that it's five o' clock that you started drinking?

A: I'm not precise with time. It was – I know it was around that time – what I said before, so –

Q: I'm not asking you to stick to the minute, okay? Just a rough estimate, though. You're telling us you did not drink any alcohol prior to approximately five p.m. Is that what you're telling us?

Defense Counsel: Objection, Your Honor. It's been asked and answered.

The Court: It has been answered. Overruled –

The State: Sure.

{¶ 85} The State also asked Hayes four times if had spoken with his cousin, Rodney Hayes, after the accident. Defense counsel objected the third time the State asked the question, but the trial court overruled the objection in the following exchange:

Q: Now you've talked to Rodney Hayes since this crash – about the crash, haven't you?

A: No.

Q: Not once?

A: Not directly about no crash, no. I – I mean, I just – in the hospital

– I got in the accident and I talked to him and said I had got in an accident. He came and seen me and he knew I got – it was on the news.

Q: Sir, my question is real simple. Have you ever talked to Rodney Hayes about this crash? Yes or no.

A: No, not about it.

Q: You ever talk to Michelle Hayes about this crash?

A: No.

Q: So in the passage of three years and being charged with criminal offenses involved with that crash, you're telling this jury you've never had a conversation about it with either one?

Defense Counsel: Objection. Asked and answered.

The Court: Overruled.

* * *

The State: Are you saying with the passage of three years and the fact that you've been charged with offenses involving this crash that you have never talked to Michelle or Rodney Hayes about this crash?

Hayes: No, I have never. I didn't even know I was the one to get indicted or anything. * * *

{¶ 86} Lastly, Hayes argues that the State violated Evid.R. 609 when it inquired whether he had ever used marijuana in the past in the following exchange:

Q: Okay. Now you smoked marijuana at some point before this crash, too, didn't you?

A: Prior to the crash I did because I was working at UPS. I was

trying to quit so I knew I was trying to get on full time.

Q: Sir, when was the last time you had smoked marijuana prior to this crash?

A: Maybe a week before. Maybe three days – a week. I know I was quitting. I was in the period of time I had talked to many a [sic] people that I was quitting and I know it takes thirty to sixty days to get out of your system. So –

Q: So you were trying to time it so that you could get that job with UPS so you could pass a clean drug test?

A: Yes, ma'am.

{¶ 87} Again, the standard for prosecutorial misconduct is whether the comments and/or questions were improper, and, if so, whether they prejudiced appellant's substantial rights. *State v. Lott*, 51 Ohio St.3d 160, 165, 555 N.E.2d 293 (1990). Evid.R. 611(B) provides that cross-examination shall be permitted on all relevant matters and matters affecting credibility. "The limitation of * * * cross-examination lies within the sound discretion of the trial court, viewed in relation to the particular facts of the case. Such exercise of discretion will not be disturbed in the absence of a clear showing of an abuse of discretion." *State v. Acre*, 6 Ohio St.3d 140, 145, 451 N.E.2d 802 (1983). Trial judges may impose reasonable limits on cross-examination based on a variety of concerns, such as harassment, prejudice, confusion of the issues, the witness's safety, repetitive testimony, or marginally relevant interrogation. *See Delaware v. Van Arndell*, 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986).

{¶ 88} We have reviewed the state's cross-examination of Hayes in its entirety.

While it is apparent that the prosecutor occasionally repeated questions and at times seemed unnecessarily contentious, her cross-examination of Hayes specifically addressed his recollection of the precise sequence of events on September 17, 2011, the day of the crash. Hayes' entire defense at trial revolved around his contention that he was not driving recklessly and was not driving under the influence of alcohol at the time of the crash.

{¶ 89} Accordingly, how much Hayes had to drink that day and his knowledge of the construction site where the crash occurred were directly at issue. Hayes denied driving on Hoover Avenue from February of 2011 to September 17, 2011. Thus, the prosecutor was entitled to question him on that topic and test the credibility of that statement. Additionally, Hayes testified on direct that he did not start drinking until approximately five o' clock p.m. on September 17, 2011, and that he only consumed two cans of Sparks alcoholic iced tea. Therefore, the prosecutor was clearly entitled to question Hayes regarding when he started drinking that day and how much alcohol he consumed. We also note that while he was being cross-examined regarding when he started drinking alcohol on the day of the crash, Hayes continually gave vague answers and kept revising his recollection. Some of his answers were simply unresponsive. It was therefore, not improper for the State to repeat the question in order to obtain a firm answer. Moreover, Shayna Harvey testified that she observed Hayes with a beer in his hand when she saw him at approximately 7:45 p.m. on the night of the crash. Shayna also testified that he was slurring his speech, mumbling his words and repeating himself as well immediately prior to the crash. Contrary to Hayes' claim that he did not start drinking until 5:00 p.m., Kendall Battle testified that he and Hayes began drinking beer at

approximately 8:30 to 9:00 a.m. on the morning of September 17, 2011. In light of this contradictory testimony, Hayes' testimony regarding when he started drinking and how much he had to drink on the day of the crash was directly at issue, and the State was entitled to cross-examine him regarding his recollection of events.

{¶ 90} Furthermore, the State's decision to question Hayes regarding whether he had spoken with his cousin, Rodney Hayes, after the crash but before he testified was not improper. The State's questioning in this regard was meant to test the credibility of Hayes' and Rodney's testimony. Moreover, during cross-examination, Hayes was again vague regarding whether he spoke to Rodney about the crash prior to the trial. We find no merit to Hayes' contention that this line of questioning denied him a fair trial.

{¶ 91} Finally, Hayes argues that the State violated Evid.R. 609 when it inquired whether he had ever used marijuana in the past. Hayes testified on direct that he had not smoked marijuana or taken any other mood altering substances on the day of the crash. However, testing of Hayes' blood within three hours of the crash established the presence of marijuana metabolite in his system that exceeded the lower threshold for intoxication in Ohio. Therefore, the State was clearly entitled to question Hayes regarding the last time he used marijuana which was relevant to the issue of whether he was driving under the influence at the time of the crash. We also note that defense counsel did not object to the State's questioning in this regard. In light of these facts, we cannot say that the State's inquiries during his cross-examination deprived Hayes of a fair trial.

{¶ 92} Hayes' seventh assignment of error is overruled.

{¶ 93} Hayes' eighth assignment of error is as follows:

{¶ 94} "THE TRIAL COURT ERRED IN OVERRULING DEFENDANT'S MOTION FOR ACQUITTAL ON COUNT THREE OF THE INDICTMENT."

{¶ 95} In his eighth assignment, Hayes contends that the trial court erred when it overruled his Crim.R. 29 motion for acquittal with respect to Count III of the indictment. Specifically, Hayes asserts that the State failed to establish beyond a reasonable doubt that his blood alcohol level was .17 or greater at the time of the crash, as required pursuant to R.C. 4511.19(A)(1)(f).

{¶ 96} "Reviewing the denial of a Crim.R. 29 motion * * * requires an appellate court to use the same standard as is used to review a sufficiency of the evidence claim." *State v. Witcher,* 6th Dist. Lucas No. L-06-1039, 2007-Ohio-3960. "In reviewing a claim of insufficient evidence, '[t]he relevant inquiry is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " (Citations omitted). *State v. Crowley,* 2d Dist. Clark No. 2007 CA 99, 2008-Ohio-4636, ¶ 12.

{¶ 97} In the instant case, evidence was adduced that the crash occurred at approximately 8:45 p.m. on September 17, 2011. Hayes was taken to the hospital shortly thereafter. Hayes' blood was drawn approximately two and one-half hours later at 11:20 p.m. At that time, it was determined that Hayes' blood had an alcohol content of .171, which was the average of two separate test results of .173 and .169.

{¶ 98} Dr. Laureen Marinetti testified that she used "retrograde extrapolation" in order to determine the estimated range of what Hayes' blood alcohol level was at the time of the crash. Dr. Marinetti testified that assuming that Hayes had stopped drinking and all of the alcohol he ingested was completely absorbed into his blood, the range of his

blood alcohol content was .197 to .235. Dr. Marinetti further testified that assuming that Hayes drank just prior to the crash and all of the alcohol had not yet completely absorbed into his blood, the range of his blood alcohol content was .134 to .242.

{¶ 99} Hayes argues that because the minimum range was .134, based on Dr. Marinetti's testimony, the State did not present sufficient evidence that his blood alcohol content was .17 or more at the time of the crash. Dr. Marinetti testified, however, that Hayes was eliminating the alcohol almost immediately from the time he ingested it. Moreover, from the time of the crash at 8:45 p.m. until the time of the blood draw at 11:20 p.m., Hayes was obviously not drinking any more alcohol. Therefore, the level of alcohol in his blood was steadily decreasing during that period of time while his body was eliminating it. As previously stated, at 11:20 p.m., Hayes' blood alcohol content was determined to be .171 after averaging the results of the two alcohol tests that were performed. Thus, the jury could find that his blood alcohol level was higher than .171 at the time of the crash.

{¶ 100} Construing the evidence presented in a light most favorable to the State, as we must, we conclude that a rational trier of fact could find all of the essential elements of the crime of OVI, in violation of R.C. 4511.19(A)(1)(f), to have been proven beyond a reasonable doubt, including that Hayes' blood alcohol content was higher than .17 at the time of the accident. Hayes' conviction for violating R.C. 4511.19(A)(1)(f) is therefore supported by legally sufficient evidence.

{¶ 101} Hayes' eighth assignment of error is overruled.

{¶ 102} Hayes' ninth assignment of error is as follows:

{¶ 103} "THE TRIAL COURT ERRED IN CONDUCTING CRITICAL STAGES OF

THE PROCEEDINGS IN DEFENDANT'S ABSENCE."

{¶ 104} In his ninth assignment, Hayes argues that the trial court committed structural error by conducting juror challenges and discussing how to respond to a jury question in chambers while he was not present.

{¶ 105} "[S]tructural errors are constitutional defects that defy analysis by harmless error standards because they affect the framework within which the trial proceeds, rather than simply [being] an error in the trial process itself." (Quotations omitted.) *State v. Perry,* 101 Ohio St.3d 118, 2004-Ohio-297, 802 N.E.2d 643, ¶ 17. Structural errors may be raised for the first time on appeal, and are cause for automatic reversal, because "[s]uch errors permeate the entire conduct of the trial from beginning to end so that the trial cannot reliably serve its function as a vehicle for determination of guilt or innocence." (Quotations omitted.) *Id.*

{¶ 106} The Ohio Supreme Court and the United States Supreme Court have cautioned against applying a structural-error analysis where, as here, the case would be otherwise governed by Crim.R. 52(B) because the defendant did not raise the error in the trial court. *See State v. Hill,* 92 Ohio St.3d 191, 199, 749 N.E.2d 274 (2001); *Johnson v. United States,* 520 U.S. 461, 466, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997). "This caution is born of sound policy. For to hold that an error is structural even when the defendant does not bring the error to the attention of the trial court would be to *encourage* defendants to remain silent at trial only later to raise the error on appeal where the conviction would be automatically reversed." *Perry* at ¶ 23.

{¶ 107} "Where a party does not object to an error at trial and the error is not a structural error, a reviewing court 'may notice only "[p]lain errors or defects affecting

substantial rights." Crim.R. 52(B). Inherent in the rule are three limits placed on reviewing courts for correcting plain error. "First, there must be an error, i.e., a deviation from the legal rule. * * * Second, the error must be plain. To be 'plain' within the meaning of Crim.R. 52(B), an error must be an 'obvious' defect in the trial proceedings. * * * Third, the error must have affected 'substantial rights.' We have interpreted this aspect of the rule to mean that the trial court's error must have affected the outcome of the trial." *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002). Courts are to notice plain error "only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus.' *State v. Byrd,* 2d Dist. Montgomery No. 22406, 2008-Ohio-5515, at ¶ 37-38. The party asserting plain error bears the burden of demonstrating it. *Id."* *State v. Taylor,* 2d Dist. Montgomery No. 22564, 2009-Ohio-806, ¶ 20.

{¶ 108} A criminal defendant has a fundamental right to be present at all critical stages of his criminal trial. *State v. Al-Mosawi,* 2d Dist. Montgomery No. 24633, 2012-Ohio-3385, ¶ 18, citing *State v. Hale,* 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 100; Sixth and Fourteenth Amendments to the United States Constitution; Ohio Constitution, Article I, Section 10. "However, a criminal defendant's absence 'does not necessarily result in prejudicial or constitutional error.' *State v. Davis,* 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, ¶ 90. *See also State v. Reed,* 10th Dist. No. 09AP-1164, 2010-Ohio-5819, ¶ 13." *State v. Morton,* 10th Dist. Franklin No. 10AP-562, 2011-Ohio-1488, ¶ 18. The presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only. *Id.,* citing *Davis* at ¶ 90 and *Snyder v. Massachusetts,* 291 U.S. 97, 107-108, 54 S.Ct. 330,

78 L.Ed. 674 (1934) *overruled on other grounds*, *Mallory v. Hogan*, 378 U.S. 1, 2, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964), fn. 1; *see also State v. Morris,* 10th Dist. Franklin No. 10AP-512, 2011-Ohio-5484, ¶ 15. Therefore, a defendant's absence in violation of Crim.R. 43(A) can constitute harmless error where he suffered no prejudice, even though such absence was improper. *Al-Mosawi* at ¶ 18; *Morton* at ¶ 18; *Morris* at ¶ 15.

{¶ 109} Hayes was present in the courtroom during voir dire. However, the judge and counsel for both parties retired to the judge's chambers to exercise challenges to the venire. Defense counsel expressly waived Hayes' presence at the in-chambers meeting. Defense counsel informed the trial court that he had discussed the procedure with Hayes, and he did not want to participate. Thus, Hayes' presence was properly waived. *State v. Frazier*, 115 Ohio St.3d 139, 2007-Ohio-5048, 873 N.E.2d 1263, ¶ 144. *See United States v. Gagnon,* 470 U.S. 522, 528, 105 S.Ct. 1482, 84 L.Ed.2d 486 (1985) (trial court "need not get an express 'on the record' waiver from the defendant for every trial conference which a defendant may have a right to attend").

{¶ 110} Additionally, the record does not affirmatively establish Hayes' absence when the trial judge and counsel for both parties discussed the jury question in chambers. The record must affirmatively indicate the absence of a defendant or his counsel during a particular stage of the trial. *Frazier* at ¶ 141. Thus, Hayes' complaint in this regard lacks merit. Moreover, the Supreme Court of Ohio has stated that a trial court's written response to a jury question is not a critical stage of the criminal proceeding, *State v. Campbell,* 90 Ohio St.3d 320, 346, 738 N.E.2d 1178 (2000), and a defendant's constitutional rights are not violated when he is absent during the conference regarding the court's response to the jury questions. *Id.* (defendant "had no right to be present at

the legal discussion of how the [jury] question should be answered"); *State v. Martin,* 2d Dist. Montgomery No. 22744, 2009-Ohio-5303; *State v. Williams,* 2d Dist. Miami No. 2004 CA 6, 2004-Ohio-6218, at ¶ 10.

**{¶ 111}** Hayes' ninth assignment of error is overruled.

**{¶ 112}** Hayes' tenth assignment of error is as follows:

**{¶ 113}** "THE TRIAL COURT ERRED IN INSTRUCTING THE JURY ON EXPERT WITNESSES WHEN NO ONE WAS QUALIFIED AS AN EXPERT WITNESS."

**{¶ 114}** In his tenth assignment, Hayes contends that the trial court erred when it instructed the jury on expert witnesses by failing to properly designate the State's expert witnesses as experts after they testified as to their qualifications.

**{¶ 115}** Evid.R. 702(B) provides that a witness may qualify as an expert by reason of his or her specialized knowledge, skill, experience, training, or education. Neither special education nor certification is necessary to confer expert status upon a witness. The individual offered as an expert need not have complete knowledge of the field in question, as long as the knowledge he or she possesses will aid the trier of fact in performing its fact-finding function. *State v. Hartman,* 93 Ohio St.3d 274, 285, 754 N.E.2d 1150 (2001).

**{¶ 116}** Pursuant to Evid.R. 104(A), the trial court determines whether an individual qualifies as an expert, and that determination will be overturned only for an abuse of discretion. *Id.* Hayes, however, did not object to the State's failure to formally offer some of its witnesses as experts, nor did he object to the trial court's failure to explicitly determine whether they qualified as experts. Additionally, Hayes did not object to the trial court's decision to instruct the jury on expert witnesses. Therefore, Hayes has

forfeited all but plain error with respect to our review of this assignment of error. *State v. Gamble*, 2d Dist. Montgomery No. 25639, 2014-Ohio-1277.

{¶ 117} For the first time on appeal, Hayes argues that the following State's witnesses who testified as experts in their respective fields were neither properly qualified nor formally tendered as experts: 1) Dr. Uptegrove, the coroner who performed the autopsy on Harvey; 2) McCoy, as a paramedic; 3) Robert Lotz, as a paramedic; 4) Robert Reed, as an accident reconstructionist; 5) Jason Ward, as an accident reconstructionist; 6) Ross Melton, as a phlebotomist; 7) Detective Seiter, as an accident reconstructionist; 8) Elizabeth Kiely, as a forensic toxicologist; 9) Brian Simons, as a forensic toxicologist; 10) Dr. Marinetti, as a laboratory director and as an expert on alcohol absorption rates.

{¶ 118} Upon review, each of the witnesses indicated by Hayes as experts were thoroughly questioned regarding their individual qualifications regarding the specialized testimony that they were being asked to provide. Through its questions outlining each witnesses' specialized knowledge, skill, training, and education, the State laid a proper foundation for the witnesses to offer expert testimony.

{¶ 119} For example, Dr. Uptegrove testified that he had been a forensic pathologist for approximately fifteen years. Dr. Uptegrove further testified that he received a bachelor's degree from Clemson University and went to medical school at the Medical University of South Carolina. Dr. Uptegrove completed his residency in anatomical and clinical pathology and then completed a fellowship in forensic pathology at the Charleston County Medical Examiner's Office in South Carolina. Significantly, Dr. Uptegrove testified that he had previously testified as an expert witness between 100 and 150 times. Under Evid.R. 702(B), Dr. Uptegrove "qualified as an expert by specialized

knowledge, skill, experience, training, or education" to testify as a forensic pathologist regarding Harvey's cause of death. Based on his qualifications, the State's failure to tender him as an expert was of no legal consequence. *See State v. Frazier*, 115 Ohio St.3d 139, 2007-Ohio-5048, 873 N.E.2d 1263, ¶ 127. The same holds true for the other witnesses who testified at trial in their respective fields. Although it failed to formally tender any of the other witnesses as experts, the record establishes that the State elicited sufficient information to qualify them as experts in their respective fields. Therefore, we find that no plain error occurred.

{¶ 120} Finally, Hayes argues that the trial court erred when it instructed the jury on expert witnesses because none of the witnesses were formally tendered as experts. Specifically, Hayes asserts that "[t]he jury instructions on experts are meaningless if there is no determination of which witness it applies to."

{¶ 121} With respect to expert witnesses, the trial court provided the jury with the following instruction:

> Now one who follows a profession or special line of work may express his or her opinion because of his or her education, knowledge, and experience. Such testimony is admitted for whatever assistance it may provide to help you arrive at a just verdict. As with other witnesses, upon you alone rests the duty of deciding what weight should be given to the testimony of experts.

{¶ 122} The State elicited sufficient testimony from its expert witnesses regarding their education, knowledge, and experience for the jury to make an accurate determination regarding which witnesses were offering specialized and technical

testimony and what weight to afford that testimony. Furthermore, even if the jury was unable to determine which of the witnesses were testifying as experts, they were instructed to weigh expert testimony as they would weigh the testimony of lay witnesses "for whatever assistance it may provide to help [them] arrive at a just verdict." Thus, any error in instructing the jury on expert witnesses was harmless.

{¶ 123} Hayes' tenth assignment of error is overruled.

{¶ 124} Hayes' eleventh assignment of error is as follows:

{¶ 125} "THE TRIAL COURT ERRED IN FINDING THAT CONSECUTIVE SENTENCE WAS MANDATORY."

{¶ 126} In his eleventh assignment, Hayes argues that the trial court erred when it ordered that his sentences for aggravated vehicular homicide and OVI be served consecutively. Specifically, Hayes asserts that the record suggests that the trial court was under the mistaken belief that consecutive sentences were mandatory pursuant to R.C. 2929.41(B)(3).

{¶ 127} In our analysis of the first assignment of error, we concluded that the trial court's statements at sentencing did not establish that it mistakenly believed that it was *required* to impose consecutive sentences pursuant to R.C. 2929.41(B)(3). Hayes' argument in this regard having already been disposed of, his eleventh assignment of error is overruled.

{¶ 128} Hayes' twelfth and final assignment of error is as follows:

{¶ 129} "THE CUMULATIVE EFFECT OF THE FOREGOING ERRORS DEPRIVED DEFENDANT OF A FAIR TRIAL."

{¶ 130} In regard to Hayes' cumulative error argument, "separately harmless

errors may violate a defendant's right to a fair trial when the errors are considered together. *State v. Madrigal,* 87 Ohio St.3d 378, 721 N.E.2d 52 (2000). In order to find 'cumulative error' present, we must first find that multiple errors were committed at trial. *Id.* at 398, 721 N.E.2d 52. We must then find a reasonable probability that the outcome of the trial would have been different but for the combination of the separately harmless errors. *State v. Thomas,* Clark App. No. 2000-CA-43, 2001-Ohio-1353." *State v. Kelly,* 2d Dist. Greene No. 2004-CA-20, 2005-Ohio-305, ¶ 33. "Where no individual, prejudicial error has been shown, there can be no cumulative error. *State v. Blankenship* (1995), 102 Ohio App.3d 534, 557, 657 N.E.2d 559." *State v. Jones,* 2d Dist. Montgomery No. 20349, 2005-Ohio-1208, ¶ 66.

**{¶ 131}** In light of our foregoing analysis, we have not found multiple instances of harmless error. Therefore, we find no prejudicial, cumulative error. *See State v. McGail*, 2015-Ohio-5384, 55 N.E.2d 513 (2d Dist.).

**{¶ 132}** Hayes' twelfth assignment of error is overruled.

**{¶ 133}** All of Hayes' assignments of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . .

HALL, J., concurs.

FROELICH, J., concurring in part and dissenting in part:

**{¶ 134}** I write separately to discuss the destruction of the blood samples, the State's arguments regarding marijuana metabolites in the blood, and the blood alcohol concentration evidence.

## DESTRUCTION OF BLOOD SAMPLES

{¶ 135} The blood samples generating the results for alcohol and marijuana metabolites were destroyed 14 to 15 months after they were obtained and approximately one month before the indictment. There is no indication in the record that, until the Appellant was indicted and arrested approximately 16 months after the offense, he was represented by counsel, knew of any investigation, or even that he was aware of the blood draws (since he was unconscious at the time).

{¶ 136} Despite the fact that, once he was charged, the Appellant was unable to obtain and test/retest the blood samples, the destroyed samples are not "materially exculpatory" evidence since any exculpatory value was not known or apparent before the destruction. *California v. Trombetta*, 467 U.S. 479, 489, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984). Pursuant to the *Youngblood* line of cases, the samples were only "potentially useful," and the Appellant was required to demonstrate bad faith.

{¶ 137} This is not to accept the State's argument that the blood samples were not exculpatory because they had been tested and were conclusively inculpatory; such a position assumes that there could have been no error (even with tests of .169 and .173 and a .17 cutoff)[2] in the procedures or result and that a defendant should not be able to "confront" the evidence against him.

{¶ 138} In certain civil cases, Ohio law distinguishes between bad faith and the lack of good faith and requires the latter. *E.g., West v. Curtis*, 7th Dist. Belmont No. 08 BE 28, 2009-Ohio-3050, ¶ 127 (party seeking prejudgment interest must show that other

---

[2] One of the toxicologists testified that a retest of the samples would "never * * * be exactly the same because there is some variability. But it should be relatively close to the same." (Tr. 486.)

party failed to make good faith effort to settle). Further, in certain other civil actions, there need not be bad faith or lack of good faith, but, for example, recklessness or "deliberate indifference." *E.g., Granato v. Davis*, 2d Dist. Montgomery No. 26171, 2014-Ohio-5572. Similarly, if evidence is destroyed when the possibility of a civil suit exists, the tort of spoliation often shifts the burden to the party that destroyed the evidence. *See, e.g., State v. McClain*, 2016-Ohio-838, __ N.E.3d __, ¶ 25-31 (2d Dist.) (discussing *Youngblood* and contrasting its burden of proof with that for spoliation of evidence).

**{¶ 139}** It is puzzling why the standards seem more open and amenable to resolving cases on the merits and all the facts in a civil context as compared to a situation where a person's liberty is at stake. However, this is not a question that an intermediate appellate court can resolve.

**{¶ 140}** The MVRCL destroyed the blood samples pursuant to its standard protocol and two months beyond the minimum preservation time established by the Ohio Administrative Code. Although it would seem technologically simple for the lab and law enforcement to communicate regarding the evidentiary value of existing samples and the status of investigations, there is no indication or even suggestion of bad faith. I therefore concur in the rejection of Appellant's assignment of error regarding this issue.

## MARIJUANA METABOLITE EVIDENCE

**{¶ 141}** In the State's case in chief, a forensic toxicologist was asked, without objection, about running the "confirmatory test for the presence of THC." (Tr. 496) However, the expert testified that THC "was determined to not be detected," but the metabolite for THC was 14 nanograms per milliliter (Tr. 499). The expert also testified without objection that 14 nanograms was above the legal 5 nanogram "threshold for

intoxication" in the State of Ohio (Tr. 500), but that he could not testify if that level would cause intoxication, since "that would be outside [his] scope." (Tr. 503).

{¶ 142} With respect to Harvey, whose toxicology screen also revealed the presence of marijuana metabolite, Dr. Uptegrove (the forensic pathologist who conducted Harvey's autopsy) testified that there was nothing to indicate that she had smoked marijuana on the day of the crash "because the parent compound [was] not present." (Tr. 196.) He stated that the presence of a marijuana metabolite would indicate that the marijuana had been "in her system for a while so I can't say whether it had been two days or two weeks." (Tr. 195-196.)

{¶ 143} The prosecutor's opening statement said the Appellant had "marijuana in his blood" (Tr. 169). The State's closing, after explaining the blood alcohol level results, more correctly stated that his "blood contained 14 nanograms of the marijuana metabolite," but went on to say that "now the Ohio legislature has determined that if someone is under the influence and they register an amount of marijuana metabolite over 5 nanograms, they are per se under the influence of that drug. Yet another way this defendant was under the influence, both alcohol and marijuana at the time of the crash." (Tr. 713).

{¶ 144} The Appellant was charged with violating R.C. 4511.19(A)(1)(f) for the per se violation of having a blood alcohol level of .17 or above; he was also charged with violating R.C. 4511.19(A)(1)(a) for driving under the influence of alcohol and/or a drug of abuse. He was not charged with violating R.C. 4511.19(A)(1)(j)(vii) or R.C. 4511.19(A)(1)(j)(viii)(I), which are per se violations for marijuana metabolites; these sections do not require that the vehicle's operator was impaired, under the influence, or

intoxicated.

{¶ 145} Evidence that a person was driving with a prohibited concentration of a marijuana metabolite in his or her blood does not prove, or even create a presumption, that the vehicle was being operated under the influence of marijuana, that the person was impaired, or that the person was intoxicated. The question asked of the witness as to the threshold for "intoxication" (a word not in the statute) and the argument that someone who tests over 5 nanograms of the metabolites has been determined by the legislature to be "under the influence" of marijuana are misstatements of the law.

{¶ 146} There is insufficient evidence that the Appellant was under the influence of a drug of abuse (i.e., marijuana), and he was not charged with operating with a prohibited metabolite level. However, the R.C. 4511.19(A)(1)(a) violation is for operating under the influence of alcohol and/or a drug of abuse and there was sufficient evidence of his being under the influence of alcohol to sustain a conviction. The Appellant did not object to the testimony concerning marijuana, and I would find it to be harmless error beyond a reasonable doubt.

BAC EVIDENCE

{¶ 147} The State's evidence was that two blood samples had an alcohol concentration of .169 and .173, respectively, averaged to .171, and that there was a range of Appellant's blood alcohol level at the time of the crash, based on certain assumptions. R.C. 4511.19(A)(1)(f) prohibits driving with a certain blood alcohol level, not the average of two tests or the range of possible blood levels based on assumptions about which little, if any, evidence was admitted.

{¶ 148} It was proven beyond a reasonable doubt that Appellant's blood alcohol

was over .08, and he could have been found guilty of that lesser offense, had either party requested that the jury consider such a charge. *See* R.C. 4511.19(A)(1)(b) (prohibiting BAC of .08 or more, but less than .17). However, no such request was made, and the Appellant was not found guilty of violating R.C. 4511.19(A)(1)(b).

{¶ 149} I would reverse the Appellant's conviction and sentence for violating R.C. 4511.19(A)(1)(f). Because the violations of R.C. 4511.19(A)(1)(f) and R.C. 4511.19(A)(1)(a) were merged for sentencing and the Appellant was sentenced on R.C. 4511.19(A)(1)(f), Appellant was not sentenced on R.C. 4511.19(A)(1)(a). I would remand for the trial court to sentence Appellant on the guilty verdict for R.C. 4511.19(A)(1)(a).

. . . . . . . . . .

Copies mailed to:

Kirsten A. Brandt
Andrew T. French
Darrell L. Heckman
Hon. Dennis J. Adkins