[Cite as *State v. York*, 2021-Ohio-1591.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | No. 109054 |
| v. | : | |
| ANDARI KARRON YORK, | : | |
| Defendant-Appellant. | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** May 6, 2021

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-19-636583-A

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Brad Meyer, Assistant Prosecuting Attorney, *for appellee.*

Cullen Sweeney, Cuyahoga County Public Defender, and Paul A. Kuzmins, Assistant Public Defender, *for appellant.*

MARY J. BOYLE, A.J.:

{¶ 1} Defendant-appellant, Ahdari York, appeals his conviction and sentence.[1] He raises five assignments of error for our review:

> 1. The trial court erred in failing to suppress Mr. York's statement where the waiver of his *Miranda* rights was not knowingly, intelligently and voluntarily made.
>
> 2. The trial court's sentence is contrary to law.
>
> 3. The state's evidence was insufficient to sustain a conviction for sexual battery.
>
> 4. The conviction for sexual battery is against the manifest weight of the evidence.
>
> 5. The trial court erred in instructing the jury on the offense of sexual battery because it is not a lesser included offense and it was not warranted by the facts.

{¶ 2} Finding no merit to his assigned errors, we affirm.

## I. Procedural History

{¶ 3} In January 2019, York was indicted on six counts, including three counts of rape in violation of R.C. 2907.02(A)(1)(c) and (2) (vaginal and anal rape by force and vaginal rape by substantial impairment), two counts of complicity to commit rape in violation of R.C. 2923.03(A)(2), and one count of kidnapping in violation of R.C. 2905.01(A)(4). York pleaded not guilty to all charges.

---

[1] York's first name was originally spelled incorrectly in the common pleas court. The incorrect spelling was "Andari." The record reflects that the state moved to amend the indictment to correct the spelling, which the trial court granted, but it does not appear to have been corrected in the common pleas court's file.

{¶ 4} In May 2019, York moved to dismiss the indictment against him due to preindictment delay. In June 2019, York moved to suppress any oral statements he made to police during questioning by police in Detroit, Michigan, in December 2018.

{¶ 5} The trial court held hearings on York's motions in late June 2019 and subsequently denied them. The case then proceeded to a jury trial.

{¶ 6} After the evidence was presented, the state requested a lesser included offense instruction on sexual battery in violation of R.C. 2907.03(A)(2) for each rape charge, which the trial court granted. The jury found York guilty of sexual battery in violation of R.C. 2907.03(A)(2), a third-degree felony, as a lesser included offense of rape under Count 2 but found him not guilty of all other charges.

{¶ 7} The trial court sentenced York to three years in prison for sexual battery and classified him as a sexually oriented offender under Megan's Law, the sex offender classification law in effect at the time York committed the crime. The trial court further notified York that he would be subject to a mandatory period of five years of postrelease control upon his release from prison. It is from this judgment that York now appeals. We will address York's assignments of error out of order for ease of discussion.

## II. Motion to Suppress

{¶ 8} In his first assignment of error, York contends that the investigators violated his Fifth Amendment rights when they "tricked [him] into reporting to his probation officer outside of his regular schedule" and coerced him to sign a *Miranda*

waiver. He therefore contends that the trial court erred when it denied his motion to suppress.

{¶ 9} "Appellate review of a motion to suppress presents a mixed question of law and fact." *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. In ruling on a motion to suppress, "the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses." *Id.*, citing *State v. Mills*, 62 Ohio St.3d 357, 366, 582 N.E.2d 972 (1992). On appeal, we "must accept the trial court's findings of fact if they are supported by competent, credible evidence." *Id.*, citing *State v. Fanning*, 1 Ohio St.3d 19, 437 N.E.2d 583 (1982). Accepting these facts as true, we must then "independently determine as a matter of law, without deference to the trial court's conclusion, whether they meet the applicable legal standard." *Id.*, citing *State v. McNamara*, 124 Ohio App.3d 706, 707 N.E.2d 539 (4th Dist.1997). In this case, however, the trial court did not make findings of fact or conclusions of law. We must therefore independently review the record to determine if it supports the trial court's decision. *See State v. Loza*, 71 Ohio St.3d 61, 73, 641 N.E.2d 1082 (1994) ("Upon an independent review of the record, we find the evidence supports the denial of appellant's motion to suppress.").

{¶ 10} "The Fifth Amendment to the United States Constitution and Article I, Section 10, of the Ohio Constitution guarantee that no person in any criminal case shall be compelled to be a witness against himself." *State v. Jackson*, 2d Dist. Greene No. 02CA0001, 2002-Ohio-4680, ¶ 19. In adopting the Fifth Amendment,

the framers were concerned that "coerced confessions are inherently untrustworthy." *Id.*, citing *Dickerson v. United States*, 530 U.S. 428, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000). Suspects may waive their constitutional right against self-incrimination "provided that waiver is voluntary." *Id.* at ¶ 20, citing *Colorado v. Connelly*, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986).

{¶ 11} In *Miranda v. Arizona*, 384 U.S. 436, 478-479, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Supreme Court held that before questioning suspects in custody, law-enforcement officials must inform them that (1) they have the right to remain silent, (2) their statements may be used against them at trial, (3) they have the right to have an attorney present during questioning, and (4) if they cannot afford an attorney, one will be appointed.

{¶ 12} To use a statement made by an accused during a custodial interrogation, the prosecution must show that (1) the accused was given the *Miranda* warnings before any interrogation, (2) upon hearing the warnings, the accused made an "express statement" that he or she desired to waive his or her constitutional rights, and (3) the accused effected a voluntary, knowing, and intelligent waiver of those rights. *State v. Edwards*, 49 Ohio St.2d 31, 38, 358 N.E.2d 1051 (1976) (overruled on other grounds), citing *Miranda*. Contrary to the second prong in *Edwards*, however, the United States Supreme Court held in recent years that the prosecution "does not need to show that a waiver of *Miranda* rights was express. An 'implicit waiver' of the 'right to remain silent' is sufficient to admit a suspect's statement into evidence." *Berghuis v. Thompkins*, 560 U.S. 370, 384,

130 S.Ct. 2250, 176 L.Ed.2d 1098 (2010). "Where the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." *Id*. That is because "the law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford." *Id*.

{¶ 13} To determine whether a valid waiver occurred, a court must "consider the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment, and the existence of threat or inducement." *Edwards* at paragraph two of the syllabus.

{¶ 14} Normally, if defendants challenge statements they made to police as involuntary, "the state must prove a knowing, intelligent, and voluntary waiver by a preponderance of the evidence." *State v. Wesson*, 137 Ohio St.3d 309, 2013-Ohio-4575, 999 N.E.2d 557, ¶ 34. But here, because York was accused of rape and his questioning was electronically recorded, his statements are presumed to be voluntary. R.C. 2933.81(B). This statute therefore shifts the burden to York to prove that the statements were not voluntary. *Id*.

### A. Suppression Hearing

{¶ 15} Ranae Reynolds was York's probation officer in Troy, Michigan, in December 2018. York had been on probation for driving under the influence since December 2017. Reynolds explained that once York was placed on probation, she

had him sign his "probation orders" or "conditions" of probation. One of those conditions included York having to report to the probation office on "short notice." It stated, "Make a truthful report to the probation officer monthly, or as often as the probation officer may require, either in person or in writing as required by the probation officer."

{¶ 16} Reynolds testified that she received a call on December 13, 2018, from Cuyahoga County investigators who wished to speak to York about a case. Reynolds stated that one or two days before the Cuyahoga County investigators were going to be there, she called York on December 24, 2018, to tell him to come to the Troy office two days later. She told him that she could not tell him why.

{¶ 17} On December 26, 2018, the Cuyahoga County investigators obtained a warrant in Oakland County Circuit Court in Michigan to collect York's buccal swab. When they arrived at the probation office, Reynolds had them wait in a conference room until York arrived. Reynolds said the conference room was large with "two long L tables" and about 15 chairs.

{¶ 18} When York arrived, Reynolds walked him to the conference room. She said that she told him that two investigators from Ohio were waiting to speak to him in the conference room. She told him that she did not know why they were there, although she testified that she did know. She did not tell him that he had to speak to the investigators, nor did she tell him that he would be in violation of his probation if he did not speak to them. She further stated that there is nothing in York's probation orders that would require York to speak to the investigators.

{¶ 19} Reynolds stated that there was one door to the conference room. The door was closed when York was talking to the investigators, but it was not locked.

{¶ 20} When York was done speaking to the investigators, he reported back to Reynolds. She did not ask him any questions about the meeting.

{¶ 21} York last reported to Reynolds on March 6, 2019. Reynolds believed that York did not report to her after that because he was in custody in Ohio. When the state informed her that he had been out on bond, she said that York should have reported to her immediately, but he did not.

{¶ 22} On cross-examination, Reynolds explained that her department "cooperate[s] with any law enforcement." If they request information, her department assists. Reynolds said it was not true that York asked her before he went into the conference room, "Do I have to go in there? Do I have to speak to those people?" Reynolds agreed that as part of York's probation, he had to submit to any search warrant.

{¶ 23} Larry Stalter testified that he was an investigator with the Cuyahoga County Prosecutor's Office, assigned to the "cold case/sexual task force." His duties included reinvestigating or investigating "for the first time old reported sexual assaults." Investigator Stalter had over 30 years of experience as a police officer and had given *Miranda* warnings hundreds of times.

{¶ 24} Investigator Stalter testified that Investigator Brian Katigbak asked him to drive to Michigan with him in late December 2018 regarding an old case that

Investigator Katigbak was assigned to. Investigator Stalter said he was there to assist Investigator Katigbak.

{¶ 25} Investigator Stalter testified that after obtaining the warrant for York's buccal swab, they went to the Troy probation office to talk to York. When York walked into the room, he sat down next to the investigators. Investigator Stalter said that they informed York that they were there "to talk about an old case in which his name came up, and then we *Mirandized* him." Investigator Stalter explained that by *Mirandized*, he meant they "read him his *Miranda* rights, letting him know that he had a right to remain silent, the right to have an attorney present if he chose one, and the rest of what's on the form." Investigator Stalter testified that as he read the form to York, the form was between them so York could read along. Investigator Stalter stated that York also had a chance "to look over it."

{¶ 26} Investigator Stalter identified the *Miranda* form that York signed and Investigator Stalter witnessed. Above York's signature, the form states,

> I have read this statement of my rights and it has been read to me, and I understand what my rights are. I'm willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me. I hereby voluntarily and intentionally waive my rights and I am willing to make a statement and answer questions.

{¶ 27} Investigator Stalter testified that they told York "a couple of different times that we were not there to arrest him." Investigator Stalter said, "It was very laid back."

{¶ 28} Investigator Stalter stated that the entire interview with York was recorded. The state played the recording in court, and Investigator Stalter identified it. The entire interview lasted approximately 22 minutes.

{¶ 29} Investigator Stalter said that York also signed a form voluntarily consenting to giving a buccal swab, which can also be heard on the recording.

{¶ 30} York testified that his probation officer called him on December 24, 2018, and told him to report to her two days later. When he went to the Troy probation office on December 26, 2018, York said that he went during his lunch break, which was only 30 minutes. After he signed in, he waited 30 minutes before his probation officer came to get him. York stated that he asked Reynolds what the Ohio investigators wanted to talk to him about, and she told him that she did not know.

{¶ 31} York testified that he also asked Reynolds whether he had to speak to them, and she replied, "yes." York said that when he was on probation to her, he tried to comply with her orders because "she had power" over him. He stated that because of what Reynolds said to him, he felt obligated to talk to the Ohio investigators.

{¶ 32} York testified that during the interview, he was "antsy" because he "was supposed to have been back to work." At the beginning of the interview, York said that his cousin called York's cell phone and told him that his "job was calling" him. York can be heard at the beginning of the electronic recording telling his cousin that he would be there soon.

{¶ 33} York stated that he did not read the *Miranda* form as Investigator Stalter was reading it. Instead, York said he listened to the investigator read it. York testified that at the same time, he was also "looking on my phone as the texts from [his] job [were] coming in." York said there was "no paper in front" of him but agreed that Investigator Stalter "showed me as he read it." Although York "was paying attention," he said he was not really paying attention because he "was thinking about [the] consequences with [his] job."

{¶ 34} York testified that when Investigator Stalter told him where to sign the form, he did not read the form before he signed it. York stated, "I never even looked at it." York agreed that Investigator Stalter told him, "[S]ign here so we can speak freely."

{¶ 35} On cross-examination, York agreed that although he quit school in the eleventh grade, he could read and write. York identified his signature on the *Miranda* form but said he never read it. He agreed, however, that he "heard [Investigator Stalter] read it." But he also stated that they were "rushing [him] through" it.

{¶ 36} York stated on cross-examination that there was more to the interview with the investigators than is shown on the tape, but he could not recall what they talked about after it ended.

{¶ 37} York further stated on cross-examination that Reynolds was either lying or could not remember when she testified that he did not ask her if he had to talk to the investigators.

**B. Analysis**

{¶ 38} York contends that two factors are at issue here: the voluntary nature of his statements and his ability to comprehend and waive his rights. He claims that the record establishes that "authorities used coercive tactics while interrogating" him by "ambush[ing] [him] in his probation officer[']s office" and by "exploiting his status as a probationer to coerce a *Miranda* waiver." He maintains that "he felt obligated to speak with those investigators from Ohio because of what [Reynolds] said."

{¶ 39} Even assuming for the sake of argument that York was in custody, which we are not concluding that he was, we find no constitutional violation. After reviewing the totality of the circumstances in this case, we find that the record supports the finding that York voluntarily, knowingly, and intelligently waived his Fifth Amendment rights.

{¶ 40} York does not cite to one case in support of his argument that he was "tricked" into coming to see his probation officer and because of that, the investigators' questioning was coercive. Instead, York cites to cases that establish a *Miranda* violation occurs when police use coercive tactics such as "physical abuse, threats, deprivation of food, medical treatment, or sleep," and none of that is at issue here. *See State v. Getsy*, 84 Ohio St.3d 180, 189, 702 N.E.2d 866 (1998).

{¶ 41} Regarding York's claim that he was "tricked" into reporting to his probation officer, the U.S. Supreme Court has explained that "probationer[s] cannot pretend ignorance of the fact that [their] probation officer 'is a peace officer, and as

such is allied, to a greater or lesser extent, with [their] fellow peace officers.'" *Minnesota v. Murphy*, 465 U.S. 420, 432, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984), quoting *Fare v. Michael C.*, 442 U.S. 707, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979). The *Murphy* court further explained that "[i]f [the probationer] did harbor a belief that his probation might be revoked for exercising the Fifth Amendment privilege, that belief would not have been reasonable. Our decisions have made clear that the State could not constitutionally carry out a threat to revoke probation for the legitimate exercise of the Fifth Amendment privilege." *Id.* at 438.

{¶ 42} York testified that he asked Reynolds whether he had to speak to the investigators, and Reynolds replied, "yes." York further testified that he tried to comply with Reynolds's orders because "she had power" over him. York stated that because of what Reynolds said to him, he felt obligated to talk to the Ohio investigators. But Reynolds denied that York asked her if he had to talk to the investigators, and she further denied telling York that he had to speak to them (although she agreed that as part of his probation, he had to submit to a search warrant).

{¶ 43} Further, the entire interview was electronically recorded and lasted only approximately 22 minutes. The investigators were polite to York during the questioning. Although York claims that he did not read the *Miranda* form and was not paying attention due to his anxiety regarding work, he admitted that he listened to Investigator Stalter read the form. York further told the investigators that he

could read and write.  And the investigators never employed improper techniques when questioning York.

{¶ 44} York simply did not meet his burden of establishing that any statements he made were involuntary.  Accordingly, we find that the trial court did not err when it denied York's motion to suppress.  We therefore overrule York's first assignment of error.

## III. Trial Evidence

{¶ 45} J.G., the victim, testified that in 1999, she was living in an apartment complex located on Garden Valley Road in Cleveland, Ohio.  Andrea Williams and "some other people" were "staying" with her at that time.

{¶ 46} On February 11, 1999, around 1:00 p.m., Williams asked J.G. to go "kick it with this guy" because she did not know her way around Cleveland very well.  J.G. agreed to go with her.  They went to "Rhonda's" house on Browning Street in Cleveland.  J.G. did not know Rhonda's last name.  When they arrived, Rhonda was not there, but "Papar and two other guys" were there.  J.G. knew Papar because she had gone to "school with him from elementary on up until high school," but she did not know the other two men.  She remembered that Papar's first name was George, but she did not know his last name.  The two other men introduced themselves to her as "Dee and Rico."  Dee told J.G. that they were from Michigan.

{¶ 47} The five of them began playing a game called "Questions."  J.G. could not remember how the game was played but knew that it was a "drinking game."  As they were playing the game, J.G. said she began to "feel funny, so she went to the

bathroom." When she came out of the bathroom, Williams was gone. The three men told her that Williams had gone to the store and "would be right back." J.G. said, "then all of a sudden[,] I just was taken out of the house" by Papar. She explained that her body was "limp," she was "weak," and she "wasn't feeling too well." She stated that she felt like she had been drugged. J.G. testified that she was "vaguely in and out" of consciousness.

{¶ 48} According to J.G., Papar carried her out of the house because she "couldn't move" or "walk." Papar put her in a car and drove what felt like "just * * * around the corner." He took her into a house and lay her on a bed. She said her legs were "just like hanging over the bed, and he just did what he did." When asked to explain, J.G. replied, "He violated me." When asked to explain further, she stated that Papar had "unconsensual" vaginal sex with her. She said that she was still going in and out of consciousness while it was happening, and her body was still limp. She did not know if he used a condom or if he ejaculated.

{¶ 49} J.G. testified that when Papar was done, "the other two do what they do." She explained that Dee and Rico were also in the bedroom. Both Dee and Rico had "unconsensual" vaginal sex with her; first Dee and then Rico. She said that she told the men "no, but probably they couldn't hear it because [she] was in and out." Although she told police shortly after the incident that she was also anally raped, at the time of trial, she could not recall if someone had anal sex with her.

{¶ 50} J.G. explained that after Rico had sex with her, she went downstairs because she heard Williams's voice. When J.G. walked into the kitchen, she said

that Williams caught her before she fell. Williams asked her what was wrong, and J.G. told her that she was ready to go because she "was afraid that they might do something else" to her. Williams took her to the bathroom and told her to wait for Papar "to come get [them], to take [them] home." She replied that she did not want Papar to take her home. At that point, Dee came into the bathroom. Dee and Williams took J.G. outside to get some air. They then took her back inside, sat her on the couch, and "start[ed] putting water on [her] face." They also tried to give her coffee, but J.G. did not drink coffee.

{¶ 51} J.G. stated that she went back outside. She told Williams that she was getting ready to leave. J.G. planned to walk to her son's godmother's house because it was nearby, but Williams and Rhonda, who finally came home, "wouldn't let [her] leave." About five minutes later, Papar "pull[ed] up," and "they stuffed [her] in the car." She could not recall who else was in the car, but she said that she was in the middle of the back seat, so she "couldn't even try to jump out of the car if [she] wanted to." They took her and Williams "to Garden Valley."

{¶ 52} J.G. testified that she never told Williams what the three men did to her. She "just wanted to get away from the whole situation." But when she got home, she "broke down." People who knew her could tell that something was wrong. They ended up calling police, and she went to the hospital, where a rape kit was collected. She also met with police on February 16, 1999, and gave them a statement.

{¶ 53} J.G. stated that the next time she talked to police was when they contacted her "recently of this year." She said she moved to Arkansas in 2010, and

Investigator Katigbak contacted her there. She met with a detective in Arkansas twice. The detective showed her several photo lineups of men, but she could not positively identify any of them as her perpetrators "because it [had] been so long."

{¶ 54} On cross-examination, J.G. denied that there was another female there by the name of "K-1."

{¶ 55} On redirect-examination, J.G. read from the statement she gave to police in February 1999. She stated:

> On Thursday, February 11, 1999 at about 1:00 p.m., me and my girlfriend Andrea met with Papar, Rico and Dee and we all decided to get together. We went over Rhonda's house at * * * Browning Avenue (up). We all started playing this game called Questions, which is when one person ask[s] another question and the other person answer[s] with a question. If you don't answer with a question, then you have to take a shot of alcohol.
>
> I remember that after we got to the third 40 ounce bottle of beer, I started feeling sick. Andrea and Rhonda took me outside on the porch to get some air. We came back in and they laid me on the couch. Andrea and Rhonda went back out on the porch * * * and Andrea told me when she came back in that I was gone and Papar * * * was gone. Papar had taken me someplace. I remember going to another house. I remember my legs hanging over a wooden part of the bed. I woke up and I was upstairs in this attic. I remember seeing and hearing about three guys in the attic. I know that one of the guys was Papar. The other was Rico[,] and Dee was the last one.
>
> I remember Papar laying on top of me. He had his penis inside of me, in my vagina. Then he turned me over and put his penis in my anus. I couldn't scream or say anything. I couldn't move. I think I was drugged.
>
> Papar went downstairs. Then Rico got on top of me. He put his penis inside of my vagina and turned me around and put his penis inside my anus. Then Rico went downstairs[,] and Dee got on top of me and put his penis inside my vagina and turned me over and put his penis inside my anus.

When Dee finished, Papar came back in the attic. He did it again, putting his penis inside my vagina. I remember him putting his penis in my mouth. Then Dee came back up. I kept saying no. I was able to start moving. Dee had me turned sideways and had his penis inside my vagina.

When I started moving, that's when he stopped. Dee got up and went downstairs. I had on a dress. I was able to walk downstairs. I was drugged. I was able to get to the kitchen. Andrea caught me from falling out. She took me to the bathroom. She asked me what happened. I was too afraid to say anything, because Papar and his friends were still there.

Andrea put water on my face. I was crying. Dee came in the bathroom asking what was wrong. I told Andrea I was ready to go home. They gave me some coffee. We sat on the porch. They started talking about what they did to me. Andrea heard this. I heard one of the girls saying that it was my fault that this happened to me because of the dress I was wearing. I remember telling her that they had no right to do this to me.

I was still feeling weak. I told them I wanted to go home and that I would walk home. They wouldn't let me go home. They said I wasn't able to. They told me to wait for Papar to return. He left to go pick up some girl. I told them to let me use the telephone, but they wouldn't.

Finally Papar came back and took us home.

What happened when you got home? I called the police and told them what happened[,] and they took me to St. Luke's Hospital.

Do you know any of the persons involved real names? No. Only my friend, Andrea Williams.

Can you describe these males? Papar is a black male. He's about five, four or five, five, about medium build, brown complexion. His ears stick out, short fade haircut. He's about 22 or 23 years old. Rico is a black male. He has a short fade haircut, about five, five, brown-skinned, medium build. He's about 25 years old. * * * Dee is a black male. He's dark-skinned, about five, six to about five, ten, small build. He is about 22 years.

How is Rhonda related to these males? I don't know. Dee and Rico are from Detroit. Rico is his cousin and was visiting from Detroit.

{¶ 56} J.G. stated that she did not make up the story.

{¶ 57} Upon recross-examination, J.G. stated that although she was "in and out of consciousness," she knew that her body had been violated and was able to give details about the sexual assaults.

{¶ 58} The court then asked J.G. a series of jury questions. In response to the jury's questions, J.G. explained that the sexual assaults started at Rhonda's house, but then when she was "taken away from that house to another house," they continued there. She further stated that she did not drink a lot because she does not "drink that much." She was worried that someone would put something in her drink because she does not trust anyone. She further denied flirting with the men during the party.

{¶ 59} Upon redirect-examination, J.G. stated that only Papar assaulted her at the second house. Dee and Rico assaulted her "back at the first house," but she stated that she did not remember Papar taking her back to the first house.

{¶ 60} Susan Eaton, the sexual assault nurse examiner ("SANE") who completed the rape kit for J.G., identified J.G.'s chart from the hospital. She explained that J.G. was brought to the hospital by ambulance for an alleged rape. According to Nurse Eaton's notes, J.G. got to the hospital at 11:30 p.m. on February 11, 1999. Nurse Eaton documented that J.G.'s "mental state" was "sleepy." J.G. had no visible injuries and was not in pain, but Nurse Eaton testified that it was possible to have a rape without visible injuries.

{¶ 61} Nurse Eaton read from her notes that night, which stated:

Patient states she was at an acquaintance's house. Admits to drinking. Patient states she thinks something was slipped in her drink. Patient states she doesn't remember how she got upstairs. Patient states there were 3 men involved in the incident. Patient states she was sexually assaulted vaginally and rectally, states another person attempted to put his penis in her mouth. Patient doesn't know if her assailant ejaculated. Attempted to get in contact with rape crisis. Unable to get in touch. Patient sleepy but awakens when her name is called. Patient states she has a headache. Rape kit is complete and rape kit was picked up by 4th district.

{¶ 62} Nurse Eaton explained that she completed the rape kit at 2:00 a.m. J.G.'s urine test showed that her blood alcohol content was .038 and there were no drugs in her system. They did not test for marijuana. Nurse Eaton said that the toxicology test was "a very basic tox screen," and they would not test for "newer things" that are "concoct[ed] on the street and don't really have tests for."

{¶ 63} On cross-examination, Nurse Eaton stated that J.G.'s urine was collected when she came into the hospital. The results did not come back until approximately 2:00 a.m. According to the toxicology report, J.G. was negative for cocaine, amphetamines, ethclorvynol, barbituates, bezodiazepines, PCP, phenothiazines, opiates, and salicylates.

{¶ 64} Andrea Dennis, a forensic scientist with the Ohio Bureau of Criminal Investigation ("BCI"), testified that her office received J.G.'s rape kit in this case on October 25, 2013. Dennis testified that scientists at her office conducted DNA testing on the anal swab, the oral swab, and the vaginal swabs. Dennis reported on June 6, 2014, that there was male DNA on several swabs from J.G.'s rape kit. Dennis received a DNA standard (buccal swab) from York on December 28, 2018. The

sample was analyzed on January 2, 2019. The results showed that the DNA found on J.G.'s vaginal and anal swabs and pubic hair combings were "sperm fractions" and were consistent with York's DNA and one other unknown male's DNA. With respect to the anal swab, Dennis stated that the likelihood that the DNA from the anal swab matched York's DNA was one in three billion. The likelihood that the DNA from the pubic hair combings matched York's was one in ten million. And the likelihood that the DNA from the vaginal swab matched York's was one in ten billion.

{¶ 65} Investigator Katigbak testified that he works in the Sexual Assault Task Force investigating "cold cases" for the Cuyahoga County Prosecutor's Office. He explained that his office receives rape kits from all cities in Cuyahoga County. Since the task force began, which was in the beginning of 2014, they have received 7,000 rape kits to process. Investigator Katigbak stated that he was assigned to this case in early 2018.

{¶ 66} Investigator Katigbak testified that the detectives assigned to the case in 1999 identified Papar as George Epps and Rico as Damon Joiner.

{¶ 67} Investigator Katigbak identified a letter dated July 17, 2014, from the Ohio BCI to the Cleveland Police Department. In the letter, BCI informed the department that there had been a CODIS match found in the national database that "would require a DNA sample from [York]." Investigator Katigbak explained that "it took so long to get to this" case simply due to "the amount of cases, 7,000 cases" that they had received. He said his department has only 25 investigators who had to work through the 7,000 cases.

{¶ 68} Investigator Katigbak finally located J.G. in Arkansas in late 2018. Investigator Katigbak created a photo lineup that contained a photo of York from 2001. J.G. did not choose York in the lineup; she chose "some other random individual" instead and wrote "50%" by it. He also created two photo arrays with Joiner and Epps. J.G. was not able to identify them in the lineups either.

{¶ 69} Investigator Katigbak located York in Detroit, Michigan, in December 2018. The state played the recording of Investigators Katigbak's and Stalter's interview with York in court. York denied that he had ever been to Cleveland. He told the investigators that he once loaned his identification card to Brady Keys so that Keys could go to Ohio to avoid prison until his child was born. When Keys went to Ohio, he was charged with driving under the influence ("DUI") and used York's identification card when he was arrested. Because of that, York stated that his first DUI case was not even his.

{¶ 70} Investigators Katigbak and Stalter showed York photos of J.G. from 1996 and 2001, and photos of George Epps and Damon Joiner. On the photos of J.G., York wrote, "I never seen this girl ever in my life." On Epps's photo, York wrote, "His name is George." York explained that Epps was "part of [his] family" but he could not explain how. And on Joiner's photo, York wrote, "I don't know this man." On the recording, Investigator Stalter can be heard saying, "He knows you." York told the investigators that his nickname was "Dee Money" without them telling him what the victim said. York continually stated that he had never been to Cleveland.

**{¶ 71}** Investigators Katigbak and Stalter told York that the woman in the photos had been sexually assaulted and asked York if he would give a DNA sample to confirm that he did not sexually assault her. York replied that he would because he had "never had sex with her."

**{¶ 72}** Investigators Katigbak testified that Epps's and Joiner's DNA were not found in J.G.'s rape kit. Through his investigation, Investigator Katigbak later learned that Rico and Damon Joiner were two different people.

## IV. Sufficiency of the Evidence

**{¶ 73}** In his third assignment of error, York argues that the state's evidence of sexual battery was insufficient for a jury to find him guilty beyond a reasonable doubt.

**{¶ 74}** A sufficiency challenge essentially argues that the evidence presented was inadequate to support the jury verdict as a matter of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). "'The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Getsy*, 84 Ohio St.3d 180, 193, 702 N.E.2d 866 (1998), quoting *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). "[A] conviction based on legally insufficient evidence constitutes a denial of due process." *Thompkins* at 386, citing *Tibbs v. Florida*, 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). When reviewing a sufficiency of the evidence claim, we review

the evidence in a light most favorable to the prosecution. *State v. Hill*, 75 Ohio St.3d 195, 205, 661 N.E.2d 1068 (1996).

{¶ 75} In this case, the state had to present evidence of the elements of sexual battery set forth in R.C. 2907.03(A)(2). This statute provides: "No person shall engage in sexual conduct with another * * * when * * * [t]he offender knows that the other person's ability to appraise the nature of or control the other person's own conduct is substantially impaired." "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B).

{¶ 76} York maintains that the state's evidence of sexual battery is insufficient for two reasons: (1) there was no reliable evidence that establishes the victim was substantially impaired, and (2) there was no evidence that York knew or had reason to believe the victim's ability to resist or consent due to substantial impairment.

{¶ 77} First, the state did not have to prove that the victim was substantially impaired for purposes of sexual battery (it did for rape, but not sexual battery as we explain in our analysis on lesser included offenses). The state did have to prove, however, that York knew that the victim's ability to appraise the nature of or control her own conduct was substantially impaired. Second, York is incorrect that for sexual battery, the state had to present evidence that he "knew or had reason to believe the victim's ability to resist or consent due to substantial impairment." York's language incorrectly tracks the rape statute under R.C. 2907.02(A)(1)(c)

instead of the sexual battery statute.[2]  But we will assume for sufficiency purposes that York meant to track the sexual battery language rather than rape.

{¶ 78} York spends a great deal of time arguing that the victim's toxicology results blood alcohol content proved that she was not substantially impaired.  He contends that because there were no drugs in her system and her blood alcohol content would not have even established that she was impaired for purposes of driving a car, she could not have been substantially impaired in this case.  We disagree.

{¶ 79} York's entire argument fails to take into account that with the passage of time, alcohol decreases in a person's blood.  *See State v. Hayes*, 2d Dist. Montgomery No. 26379, 2016-Ohio-7241, ¶ 56, quoting *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) (alcohol has an "'evanescent nature,'" which means that "the level of alcohol in blood decrease[s] with the passage of time").  In *Hayes*, the defendant argued that the state did not present sufficient evidence that his blood alcohol content was .17 or more at the time of a crash.  But the Second District explained that "from the time of the crash at 8:45 p.m. until the time of the blood draw at 11:20 p.m., Hayes was obviously not drinking any more alcohol.  Therefore, the level of alcohol in his blood was steadily decreasing during that period of time while his body was eliminating it."  *Id.* at ¶ 99.

---

[2] R.C. 2907.02(A)(1)(c) provides: "No person shall engage in sexual conduct with another * * * when * * * [t]he other person's ability to resist or consent is substantially impaired because of a mental or physical condition * * * and the offender knows or has reasonable cause to believe that the other person's ability to resist or consent is substantially impaired[.]"

{¶ 80} Here, the victim testified that she went to Rhonda's house with Williams around 1:00 p.m. They began playing drinking games with the men. They were drinking out of 40-0z bottles of beer. The victim testified that she began to feel "funny," and her body was "weak" and "limp." She was "in and out of consciousness." She had to be carried to the car. She could not walk. Later, she had to wait around for someone to take her home. Although the victim did not testify as to how long she was with Williams, Rhonda, and the men, she did not go to the hospital until 11:30 p.m. The fact that the victim's blood alcohol content was below the legal limit for driving impairment therefore has no bearing on this case because there is no way to know how long it was between the victim's last drink and the time she went to the hospital. Moreover, the SANE nurse testified that the hospital does not test all possible drugs because there is no test for many street drugs.

{¶ 81} The cases that York cites in support of his argument that this court should find insufficient evidence of sexual battery are distinguishable from the present case. In *State v. Noernberg*, 8th Dist. Cuyahoga No. 97126, 2012-Ohio-2062, this court found insufficient evidence of rape in relevant part because the victim "fully was able to say 'no' to intercourse and give her reasons why; she wanted to remain a virgin." *Id.* at ¶ 25. Additionally, the victim could explain why she decided "to give oral sex to at least two of the males, i.e., she did not want them to kick her out of Noernberg's home." *Id.* The state also did not present any evidence that "any particular aspects of [the victim's] behavior * * * should have alerted Noernberg to her substantial impairment, such as stumbling, falling, slurred speech,

passing out, or vomiting." *Id.* at ¶ 27. Here, however, the victim testified that she was weak, limp, and had to be carried because she could not walk, she was "in and out of consciousness," and that during the sexual acts, her legs were just hanging over the bed. Thus, there was sufficient evidence presented in this case that should have alerted York to the fact that the victim could not appraise the nature of or control her own conduct due to her substantial impairment.

{¶ 82} York also cites *State v. Theodus*, 8th Dist. Cuyahoga No. 97290, 2012-Ohio-2064. *Theodus* is distinguishable for the same reason as *Noernberg* because Theodus and Noernberg were codefendants, and their appeals were companion cases before this court.

{¶ 83} The final case that York cites is *State v. Doss*, 8th Dist. Cuyahoga No. 88443, 2008-Ohio-449. *Doss* is distinguishable from the present case because in *Doss*, although there was evidence that the victim was substantially impaired earlier in the evening, there was insufficient evidence that the defendant was aware that the victim was substantially impaired at the time of the rape. According to the evidence presented, the victim went to defendant's house voluntarily. And according to the defendant's statement that was not countered at trial, the encounter was consensual, the victim had a "consensual conversation with him," and she "was in control of her actions." *Id.* at ¶ 19-25.

{¶ 84} Accordingly, we find that the state presented sufficient evidence based on the victim's testimony that, if believed, established that York committed sexual battery against the victim.

{¶ 85} We therefore overrule York's third assignment of error.

## V. Weight of the Evidence

{¶ 86} In his fourth assignment of error, York argues that his conviction is against the manifest weight of the evidence.

{¶ 87} Unlike sufficiency of the evidence, a challenge to the manifest weight of the evidence attacks the credibility of the evidence presented. *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541. Because it is a broader review, a reviewing court may determine that a judgment of a trial court is sustained by sufficient evidence, but nevertheless conclude that the judgment is against the weight of the evidence. *Id.*, citing *State v. Robinson*, 162 Ohio St. 486, 124 N.E.2d 148 (1955).

{¶ 88} In determining whether a conviction is against the manifest weight of the evidence, the court of appeals functions as a "thirteenth juror." *Id.* In doing so, it must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine "'whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 485 N.E.2d 717 (1st Dist.1983). Reversing a conviction as being against the manifest weight of the evidence and ordering a new trial should be reserved for only the "'exceptional case in which the evidence weighs heavily against the conviction.'" *Id.* quoting *Martin*.

{¶ 89} York makes the same argument with respect to manifest weight of the evidence that he did regarding sufficiency of the evidence, namely, that the state's theory that the victim was substantially impaired is not supported by scientific or physical evidence. But we previously found this argument to be without merit and will not address it a second time.

{¶ 90} York further contends that because there was no evidence of any injuries to the victim, "no bruises[,] [n]o scrapes[,] [and] [n]o scratches," and because Epps's and Joiner's DNA was not found in the victim's rape kit, the "state's theory or J.G.'s story" was not corroborated in any way.

{¶ 91} Although Epps's and Joiner's DNA was not found in the victim's rape kit, York's was. But York told police that he had never been to Cleveland. Regarding the fact that the victim had no visible injuries, the SANE nurse testified that it is possible to have a rape without visible injuries.

{¶ 92} After reviewing the entire record, weighing the evidence and all reasonable inferences, considering the credibility of the witnesses and determining whether the trial court clearly lost its way and created such a manifest miscarriage of justice such that York's sexual battery conviction must be reversed and a new trial ordered, we find that it did not. This is simply not the exceptional case where the evidence weighs heavily against the conviction.

{¶ 93} We further note that although we are required to independently weigh the evidence, including the credibility of the witnesses, the Ohio Supreme Court made clear that we "must always be mindful of the presumption in favor of the finder

of fact." *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 21, citing *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 461 N.E.2d 1273 (1984) (although *Eastly* was a civil case, the Supreme Court thoroughly discussed sufficiency and manifest weight of the evidence reviews in civil and criminal cases and concluded that the reviews are the same whether the case is civil or criminal).

{¶ 94} Regarding this presumption in favor of the finder of fact, the Supreme Court explained:

> In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact. In determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the findings of fact. * * * If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment.

*Id.*

{¶ 95} In this case, although the jury found that the state did not prove that the victim was substantially impaired, it clearly believed the victim that York committed a sexual act against her when he knew that her ability to appraise the nature of or control her own conduct was substantially impaired. Although the evidence presented at trial was susceptible of more than one construction, we are mindful of the presumption in the favor of the jury.

{¶ 96} York's fourth assignment of error is overruled.

**VI. Lesser Included Offense**

{¶ 97} In his fifth assignment of error, York argues that the trial court erred when it instructed the jury on the offense of sexual battery because sexual battery is not a lesser included offense of rape and the instruction was not warranted by the facts.

{¶ 98} A trial court's decision to grant or deny a requested jury instruction is reviewed under an abuse of discretion standard. *State v. Williams*, 8th Dist. Cuyahoga No. 90845, 2009-Ohio-2026, ¶ 50. "Abuse of discretion" has been described as a ruling that lacks a "sound reasoning process." *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990). However, whether an offense is a lesser included offense of another offense is a question of law that we review de novo. *State v. Deanda*, 136 Ohio St.3d 18, 2013-Ohio-1722, 989 N.E.2d 986, ¶ 6 (calling the inquiry a "purely legal question").

{¶ 99} When a lesser included offense is included within the offense charged in a complaint or indictment, the defendant may be found guilty of the lesser included offense even though the lesser included offense was not separately charged in the complaint or indictment. Crim.R. 31(C); *see also* R.C. 2945.74; *State v. Lytle*, 49 Ohio St.3d 154, 157, 551 N.E.2d 950 (1990). Lesser included offenses need not be separately charged because when an indictment or complaint charges a greater offense, "'it necessarily and simultaneously charges the defendant with lesser included offenses as well.'" *State v. Smith*, 121 Ohio St.3d 409, 2009-Ohio-787, 905 N.E.2d 151, ¶ 15, quoting *Lytle* at 157.

{¶ 100} The question of whether a particular offense should be submitted to the finder of fact as a lesser included offense involves a two-tiered analysis. *Deanda* at ¶ 6, citing *State v. Evans*, 122 Ohio St.3d 381, 2009-Ohio-2974, 911 N.E.2d 889, ¶ 13. The first tier, also called the "statutory-elements step," is a purely legal question, wherein we determine whether one offense is generally a lesser included offense of the charged offense. *Id.*, citing *State v. Kidder*, 32 Ohio St.3d 279, 513 N.E.2d 311 (1987).

{¶ 101} In determining whether one offense is a lesser included offense of another, a court must consider whether (1) "one offense carries a greater penalty than the other," (2) "some element of the greater offense is not required to prove commission of the lesser offense" and (3) "the greater offense as statutorily defined cannot be committed without the lesser offense as statutorily defined also being committed." *Evans* at paragraph two of the syllabus, clarifying *State v. Deem*, 40 Ohio St.3d 205, 533 N.E.2d 294 (1988). In clarifying *Deem*, the Ohio Supreme Court removed the word "ever" from the third prong of the test (which was the second prong under the *Deem* test) that had previously stated, "the greater offense cannot, as statutorily defined, *ever* be committed without the lesser offense, as statutorily defined, also being committed." (Emphasis added.) *Evans* at ¶ 25.

{¶ 102} After it has been determined that the offense is a lesser included offense, the second tier of determining whether the lesser included offense should be submitted to the jury mandates that courts look to the evidence in a particular case and determine whether "'a jury could reasonably find the defendant not guilty

of the charged offense, but could convict the defendant of the lesser included offense.'" *Deanda* at ¶ 6, quoting *Evans* at ¶ 13; *see also State v. Thomas*, 40 Ohio St.3d 213, 216, 533 N.E.2d 286 (1988).

{¶ 103} York challenges both prongs of the analysis. In the first part of the analysis, we must determine if sexual battery is a lesser included offense of rape.

{¶ 104} Rape under R.C. 2907.02(A)(1)(c) provides:

No person shall engage in sexual conduct with another * * * when [t]he other person's ability to resist or consent is substantially impaired because of a mental or physical condition or because of advanced age, and the offender knows or has reasonable cause to believe that the other person's ability to resist or consent is substantially impaired because of a mental or physical condition or because of advanced age.

{¶ 105} Sexual battery under R.C. 2907.03(A)(2) provides:

No person shall engage in sexual conduct with another * * * when * * * [t]he offender knows that the other person's ability to appraise the nature of or control the other person's own conduct is substantially impaired.

{¶ 106} The first step of the *Evans* test is easily met. Rape under R.C. 2907.02(A)(1)(c) is a first-degree felony, and sexual battery under R.C. 2907.03(A)(2) is a third-degree felony. R.C. 2907.02(B); R.C. 2907.03(B).

{¶ 107} The second step requires this court to determine if there is "some element" of the greater offense that is not required to prove the lesser offense. This step is easily met as well. Rape requires proof that the victim's ability to resist or consent was substantially impaired because of a mental or physical condition. Sexual battery does not require proof of this element.

{¶ 108} We turn now to the third part of the *Evans* test, i.e., determining whether "the greater offense as statutorily defined cannot be committed without the lesser offense as statutorily defined also being committed." In discussing this prong, the Ohio Supreme Court explained after *Evans* that the specific facts of a particular case are "still irrelevant," but courts should "no longer * * * look at the elements in a vacuum." *Deanda*, 136 Ohio St.3d 18, 2013-Ohio-1722, 989 N.E.2d 986, ¶ 18. The Supreme Court made clear that "a menu of unrelated, fact-specific hypotheticals" or "implausibles" should not be considered in the analysis. *Id.*; *Evans*, 122 Ohio St.3d 381, 2009-Ohio-2974, 911 N.E.2d 889, at ¶ 24. "Rather, it is more instructive to consider the charged crime's relationship with potential lesser included offenses, and then follow the language of the applicable statutes in order to ensure the defendant's constitutional right to notice." *Deanda* at ¶ 18. In clarifying the *Deem* test, the Ohio Supreme Court explained in *Evans* that the test now "requires a comparison of the elements of the respective offenses in the abstract to determine whether one element is the functional equivalent of the other. If so, and if the other parts of the test are met, one offense is a lesser included offense of the other." *Evans* at ¶ 25.

{¶ 109} This court has previously held, even under the more rigid *Deem* test, that sexual battery under R.C. 2907.03(A)(2) is a lesser included offense of rape under R.C. 2907.02(A)(1)(c). *State v. Felton*, 8th Dist. Cuyahoga No. 92295, 2010-Ohio-4105, ¶ 35. In finding the Tenth District's reasoning in *State v. Stricker*, 10th

Dist. Franklin No. 03AP-746, 2004-Ohio-3557, to be persuasive, we quoted from

*Strickler* and explained:

> "[S]exual battery under R.C. 2907.03(A)(2) does not require that the offender act with 'actual knowledge.' Rather, the statute merely requires that the offender act 'knowingly.' R.C. 2901.22(B) defines 'knowingly' as follows:
>
> "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist.
>
> "Because 'knowledge' as defined above requires no more than a person's belief that a set of circumstances 'probably' exist, rather than the person's absolute or actual knowledge that the circumstances are in fact true, the mental state attributable to the offender in both the sexual battery and the rape statute at issue is the same, i.e., knowledge. *See In re Sechler*[, 11th Dist. Trumbull No. 96-T-5575, 1997 Ohio App. LEXIS 3886 (Aug. 29, 1997)]. Thus, the mens rea element for rape under R.C. 2907.02(A)(1)(c) is not lesser than the mens rea for sexual battery under R.C. 2907.03(A)(2)." *Id.* at ¶ 31.
>
> The *Stricker* court found sexual battery under R.C. 2907.03(A)(2) to be a lesser included offense of rape under R.C. 2907.02(A)(1)(c). We agree. Rape requires that the offender knew or had reason to believe that the victim's ability to consent to or resist the offender's acts was substantially impaired, while sexual battery requires that the offender knew the victim's ability to appraise or control his or her own conduct was substantially impaired. If an offender knew that a victim could not appraise or control his or her own acts, then the offender would certainly know that the victim could not consent to or resist another's advances. Thus, the second prong of the *Deem* test is met [which is the third prong of the *Evans* test].

*Felton* at ¶ 34-35.

{¶ 110} We reaffirm our holding in *Felton* and conclude that the trial court correctly found that sexual battery under R.C. 2907.03(A)(2) is a lesser included offense of rape under R.C. 2907.02(A)(1)(c).

{¶ 111} York cites to *State v. Hines*, 12th Dist. Clermont No. CA2017-06-025, 2018-Ohio-1780, in support of his argument that sexual battery is not a lesser included offense of rape. *Hines*, however, dealt with sexual battery under R.C. 2907.03(A)(3), which provides: "No person shall engage in sexual conduct with another * * * when * * * [t]he offender knows that the other person submits because the other person is unaware that the act is being committed." York was convicted of sexual battery under R.C. 2907.03(A)(2). Accordingly, *Hines* is inapplicable to this case.

{¶ 112} Having determined that sexual battery under R.C. 2907.03(A)(2) is a lesser included offense of rape under R.C. 2907.02(A)(1)(c), we now must determine whether "'a jury could reasonably find the defendant not guilty of the charged offense but could convict the defendant of the lesser included offense.'" *Deanda*, 136 Ohio St.3d 18, 2013-Ohio-1722, 989 N.E.2d 986, at ¶ 6, quoting *Evans*, 122 Ohio St.3d 381, 2009-Ohio-2974, 911 N.E.2d 889; *see also Thomas*, 40 Ohio St.3d 213, 216, 533 N.E.2d 286 (1988).

{¶ 113} Based on the evidence presented in this case, we conclude that the jury could have reasonably found York not guilty of rape, but guilty of sexual battery. If the jury found that the state failed to prove that the victim was impaired, i.e., intoxicated or drugged, but found that York knew that the victim was not able to appraise the nature of or control her own conduct due to her substantial impairment, then the jury could find that the state proved the elements of sexual

battery but not rape. We therefore find that the trial court did not err when it instructed the jury on sexual battery.

{¶ 114} Accordingly, we overrule York's fifth assignment of error.

## VII. Sentence

{¶ 115} In his second assignment of error, York argues that his three-year prison sentence was contrary to law because the trial court "erroneously considered as a seriousness factor the fact [that] the underlying offense was a sex offense." He further contends that the trial court failed to consider his age at the time of the offense as a mitigating factor.

{¶ 116} R.C. 2953.08(G)(2) states that when reviewing felony sentences, an "appellate court's standard for review is not whether the sentencing court abused its discretion." Rather, the statute states that if we "clearly and convincingly" find that (1) "the record does not support the sentencing court's findings under" certain sentencing provisions not at issue in this case, or that (2) "the sentence is otherwise contrary to law," then we "may increase, reduce, or otherwise modify a sentence * * * or [we] may vacate the sentence and remand the matter to the sentencing court for resentencing."

{¶ 117} When sentencing a defendant, the court must consider the purposes and principles of felony sentencing set forth in R.C. 2929.11 and the seriousness and recidivism factors in R.C. 2929.12. *State v. Hodges*, 8th Dist. Cuyahoga No. 99511, 2013-Ohio-5025, ¶ 7. In this case, York challenges only the trial court's findings under R.C. 2929.12.

{¶ 118} R.C. 2929.12 sets forth a nonexhaustive list of factors that the court must consider in relation to the seriousness of the underlying crime and likelihood of recidivism, including "(1) the physical, psychological, and economic harm suffered by the victim, (2) the defendant's prior criminal record, (3) whether the defendant shows any remorse, and (4) any other relevant factors." *State v. Kronenberg*, 8th Dist. Cuyahoga No. 101403, 2015-Ohio-1020, ¶ 26, citing R.C. 2929.12(B) and (D).

{¶ 119} However, the trial court is not required to use particular language or make specific findings on the record regarding its consideration of the factors under R.C. 2929.11 or 2929.12 before imposing the sentence. *State v. Boczek*, 8th Dist. Cuyahoga No. 103811, 2016-Ohio-5708, ¶ 22, citing *State v. Wilson*, 129 Ohio St.3d 214, 2011-Ohio-2669, 951 N.E.2d 381. In fact, "[c]onsideration of the factors is presumed unless the defendant affirmatively shows otherwise." *State v. Seith*, 8th Dist. Cuyahoga No. 104510, 2016-Ohio-8302, ¶ 12, citing *State v. Keith*, 8th Dist. Cuyahoga Nos. 103413 and 103414, 2016-Ohio-5234. The Ohio Supreme Court recently reaffirmed this holding in *State v. Jones*, Slip Opinion No. 2020-Ohio-6729, ¶ 20.

{¶ 120} At the sentencing hearing, the trial court stated in relevant part:

Mr. York, when I look at the factors here, I have to look at the factors as to what occurred here as the injury to the victim, psychological and physical condition. The economic harm. There is no doubt that this offense is the victim's own testimony and her own statement to this court how this has psychologically harmed her. The fact that I look at this, that this was a sexual offense is also a serious factor that this court has to consider.

When I look at the less serious offenses, there is clear testimony in this case that alcohol was involved, people were drinking and the fact that she was looking, I think in her words, for a kick at that party that night, I don't know if you want to call that a less serious offense, but there was alcohol being used and I think that's where the jury came back with a lesser included of sexual battery on this case.

When I look at the recidivism factors, it is clear your criminal history, that you have been convicted of crimes of unarmed robbery, drugs, receiving stolen property, OVI. You were given probation and there was probation terminated and a sentence imposed. So you have a criminal history, but not for sex offenses.

So then I have to look at this and what makes it tragic is that unfortunately for you, medical technology and DNA has advanced to a point where you could be in a crime 23 years later. When I look at what occurred 23 years ago, you made a mistake that night. I heard from your family and there is no question by the comments of your family and friend that you are a good father, good husband, good friend, and a person who has done good things well in this world.

However, I have to look at the crime that occurred in 1999 when you were 23 years old and I have to impose a sentence based on a crime that occurred and the facts of this case. When I look at those factors and I look at the violence that occurred, the sexual violence that occurred with this woman and the factors I just went over in 2929.11, a prison sentence would be appropriate.

{¶ 121} With respect to York's argument that the trial court failed to take his age at the time of the offense into consideration, we note again that the trial court did not have to explicitly discuss any mitigating factors on the record. In this case, however, the trial court did just that. It discussed York's young age at the time of the crime more than once when it was sentencing York. Therefore, the trial court clearly considered York's age when deciding what sentence to impose.

{¶ 122} York further argues that the trial court improperly considered the nature of his offense, namely, the fact that it was a sex offense, as an aggravating

factor when sentencing him. He cites to several cases in support of his argument. These cases, however, stand for the proposition that if a trial court considers only an element of the offense as an aggravating factor, without considering any other factor, it is improper. For example, in one of the cases cited by York, *State v. Stroud*, 7th Dist. Mahoning No. 07 MA 91, 2008-Ohio-3187, the trial court found that Stroud committed the worst form of the offense based solely on the fact that "a life was taken" when Stroud committed the offense of voluntary manslaughter. The Seventh District held that because the trial court did not explain how this was something more than an element of the offense and was "present in every case where a court is sentencing an offender for a voluntary manslaughter[,] * * * highlighting this fact does not show why this particular case is a more serious form of that offense." *Id.* at ¶ 52.

{¶ 123} In this case, however, the trial court gave many reasons for imposing its sentence (even though it did not have to), including the psychological harm that York caused the victim. The victim informed the court in the presentence investigation report that the crime still affects her. She stated that she does not go anywhere by herself and is always with her husband. She further stated that she is "paranoid." Therefore, the cases that York cites to are inapplicable here.

{¶ 124} Additionally, the cases York cites to (except for *Stroud*) were all pre-*Foster* cases when a trial court had to find that an offense was the worst form of the offense before sentencing an offender to the maximum sentence. *See State v. Foster*, 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470; former R.C. 2929.14(C). Former

R.C. 2929.14(C) only authorized a trial court to impose the maximum sentence upon the following: (1) offenders who committed the worst forms of the offense; (2) offenders who posed the greatest likelihood of committing future crimes; (3) certain major drug offenders; and (4) certain repeat violent offenders. The statute embodied a public policy disfavoring maximum sentences except for the most deserving offenders. *State v. Edmonson*, 86 Ohio St.3d 324, 328, 326, 1999-Ohio-110, 715 N.E.2d 131.

{¶ 125} Pre-*Foster*, trial courts also had to make certain findings before imposing a sentence that was more than the minimum sentence allowed. Former R.C. 2929.14(B) (trial courts had to impose the shortest prison sentence unless the trial court found "(1) The offender was serving a prison term at the time of the offense, or the offender previously had served a prison term" or "that the shortest prison term will demean the seriousness of the offender's conduct or will not adequately protect the public from future crime by the offender or others.").

{¶ 126} In one of the other cases cited by York, *State v. Clagg*, 4th Dist. Washington No. 04CA30, 2005-Ohio-4992, the Fourth District found that the trial court erred when sentencing the defendant for aggravated arson because it considered the danger that Clagg posed to firefighters when committing the offense. *Id.* at ¶ 26. The court explained that "[b]ecause the risk of harm to the firefighters was an element of the offense, we find that the trial court could not properly consider it as a factor justifying a greater than minimum sentence without explaining why the danger was something more than a required element of the offense." *Id.*

{¶ 127} However, in *Foster*, the Ohio Supreme Court held in pertinent part that "[t]rial courts have full discretion to impose a prison sentence within the statutory range and are no longer required to make findings or give their reasons for imposing maximum, consecutive, or more than the minimum sentences." *Id.* at paragraph seven of the syllabus. Although the General Assembly revived the consecutive sentencing provision in Am.Sub.H.B. No. 86, which became effective on September 30, 2011, it never revived the "more than the minimum" and maximum sentencing provisions. *State v. Blackburn*, 8th Dist. Cuyahoga Nos. 97811 and 97812, 2012-Ohio-4590, ¶ 30; *State v. McHugh*, 8th Dist. Cuyahoga No. 108372, 2020-Ohio-1024, ¶ 22. Therefore, the cases that York cites to are not applicable.

{¶ 128} We further note that in making these arguments, York is essentially challenging the trial court's weighing of the seriousness and recidivism factors set forth in R.C. 2929.12 and asking this court to independently reweigh those factors. With respect to our review of a trial court's consideration of the factors set forth in R.C. 2929.12, the Ohio Supreme Court recently explained:

> R.C. 2953.08(G)(2)(a) permits an appellate court to modify or vacate a sentence if it clearly and convincingly finds that "the record does not support the sentencing court's findings under" certain specified statutory provisions." But R.C. 2929.11 and 2929.12 are not among the statutory provisions listed in R.C. 2953.08(G)(2)(a). Only R.C. 2929.13(B) and (D), 2929.14(B)(2)(e) and (C)(4), and 2929.20(I) are specified.
>
> * * *
>
> R.C. 2953.08(G)(2)(b) therefore does not provide a basis for an appellate court to modify or vacate a sentence based on its view that the sentence is not supported by the record under R.C. 2929.11 and 2929.12.

* * *

> Nothing in R.C. 2953.08(G)(2) permits an appellate court to independently weigh the evidence in the record and substitute its judgment for that of the trial court concerning the sentence that best reflects compliance with R.C. 2929.11 and 2929.12. In particular, R.C. 2953.08(G)(2) does not permit an appellate court to conduct a freestanding inquiry like the independent sentence evaluation [the Supreme Court] must conduct under R.C. 2929.05(A) when reviewing a death penalty-sentence.

*Jones*, Slip Opinion No. 2020-Ohio-6729, ¶ 28, 39, 42.

**{¶ 129}** We therefore cannot do what York is requesting us to do, namely, independently weigh the evidence in the record and substitute our judgment for that of the trial court regarding the seriousness and recidivism factors set forth in R.C. 2929.12. Because we cannot second guess the trial court's application of these factors, York's argument is without merit.

**{¶ 130}** Accordingly, we overrule York's second assignment of error.

**{¶ 131}** Judgment affirmed.

It is ordered that appellee recover from appellant the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY J. BOYLE, ADMINISTRATIVE JUDGE

SEAN C. GALLAGHER, J., and
EMANUELLA D. GROVES, J., CONCUR